717 F.2d 401
 CISCO COOPERATIVE GRAIN COMPANY and Prairie Central Railway
Company, Petitioners,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents.
Illinois Central Gulf Railroad Co. and Patrick W. Simmons,
etc., Intervening Respondents.
 Nos. 82-2288, 82-2289.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 9, 1983.
Decided Sept. 15, 1983.
 
 Thomas F. McFarland, Jr., Belnap, Spencer & McFarland, Chicago, Ill., for petitioners.
 Sidney L. Strickland, Jr., I.C.C., Washington, D.C., for respondent.
 Richard M. Kamowski, Ill. Central Gulf R.R. Chicago, Ill., for intervening-respondents.
 Before CUMMINGS, Chief Judge, BAUER, Circuit Judge, and FAIRCHILD, Senior Circuit Judge.
 CUMMINGS, Chief Judge.
 
 
 1
 These consolidated petitions for review seek to set aside decisions of the Interstate Commerce Commission ("ICC") addressing the interaction of the feeder railroad development program, 49 U.S.C. Sec. 10910, created by the Staggers Rail Act of 1980, and the abandonment program contained in 49 U.S.C. Secs. 10903-10905. Petitioner Cisco Cooperative Grain Company ("Cisco") sought to acquire under the feeder railroad development program 13.41 miles of track between Cisco, Illinois, and Green's Switch, Illinois ("the Cisco line"). Petitioner Prairie Central Railway Company ("PACY") sought to acquire under the same program 45.2 miles of track between Bloomington, Illinois, and Mason City, Illinois ("the Bloomington line"). After both petitioners had filed notices of intent to purchase the lines under the feeder program in accordance with then-existing ICC regulations, 49 C.F.R. 1128.2(a) (1981), but before they had filed actual applications to purchase, Illinois Central Gulf Railroad Company ("ICG") filed applications to abandon both lines. In a decision served May 10, 1982, the ICC decided that ICG's abandonment application took precedence over Cisco's previously-filed notice of intent to purchase the Cisco line and consequently dismissed its notice of intent to purchase and rejected its motion to dismiss the abandonment application (Jt.App. 32-35). The next day it served a decision granting ICG's abandonment application for the Cisco line (Jt.App. 36-39). On July 23, the ICC served two decisions, dismissing PACY's notice of intent to purchase the Bloomington line and granting ICG's abandonment application for that line (Jt.App. 45-47; 48-51). The basis of the ICC decisions dismissing the notices of intent to purchase under the feeder program was that a feeder development purchase application, rather than simply a notice of intent to file an application, is necessary to engage the Commission's jurisdiction under 49 U.S.C. Sec. 10910. An abandonment application, even if filed after a notice of intent to purchase under the feeder program, bars ICC jurisdiction under Section 10910 as long as it is filed before a feeder development purchase application. The Commission therefore dismissed the feeder development proceedings for both Cisco and PACY.
 
 
 2
 Cisco filed an administrative appeal of the ruling, which was denied (App. 40-44). The Commission, however, did recognize that the dilemma in the present case was caused by its own regulation, which required a party desiring to acquire a line under the feeder railroad development program to file a notice of intent to purchase the line at least 90 days prior to filing an application to purchase. See 49 C.F.R. Sec. 1128.2(a) (1981). Thus ICG was able to defeat the Commission's jurisdiction under the feeder line program by filing an abandonment application during the 90-day waiting period after Cisco filed its notice of intent to purchase. The Commission therefore began an internal review of the regulations, resulting in adoption of new regulations which eliminate the pre-application notice period. See Ex Parte No. 395 (Sub-No. 1), Feeder Railroad Development Program, 48 Fed.Reg. 9649 (March 8, 1983, effective April 7, 1983).
 
 
 3
 As an alternative means of acquiring the line, Cisco filed an offer of financial assistance in the abandonment proceeding in accordance with 49 U.S.C. Sec. 10905. A purchaser under Section 10905, however, does not receive the same benefits as a purchaser under the feeder program. Under the feeder line statute, the Commission can require the selling carrier to provide the buyer with certain trackage rights and reasonable joint rates. A feeder program purchaser may elect to be exempt from Title 49 except as to joint rates, and may determine preconditions to be met by shippers who want service over the acquired line. These benefits are not available to a purchaser under Section 10905. In accordance with Section 10905 procedures, the ICC on August 24, 1982, set the purchase price for the line, and Cisco accepted the terms of purchase without prejudice to its position that it is entitled to purchase the line under the feeder development program. That decision is the subject of an appeal by ICG, also decided today by this Court. See Illinois Central Gulf Railroad Co. v. ICC, 717 F2d. 408 (1983). Cisco's offer of financial assistance postponed the issuance of the abandonment certificate for the Cisco line. PACY's offer of financial assistance for the Bloomington line, on the other hand, was not timely, and its dismissal was not appealed. This Court did, however, issue a partial stay of the abandonment certificate for the Bloomington line on August 26, 1982, which allowed ICG to discontinue service and abandon the line, but prohibited it from removing the track or commencing sale of the real estate (App. 52-53).
 
 
 4
 The petitions for review ask us to decide if the ICC actions in these cases are in accordance with the governing statute. After the cases were briefed, but before oral argument, Congress passed Section 506 of the Rail Safety and Service Improvement Act of 1982 (RSSIA), Pub.L. No. 97-468, 96 Stat. 2553-2554, which amends 49 U.S.C. Sec. 10910 embodying the feeder railroad development program. Needless to say, the parties dispute the applicability of this amendment; the ICC has been singularly unhelpful in interpreting its impact since the Commission was unable to "reach a majority consensus" on the meaning of the legislative change. We begin our analysis of this case with a discussion of the statutory amendment.
 
 
 5
 Before the 1983 amendment, 49 U.S.C. Sec. 10910(b)(1) provided that the feeder line development program was available to a financially responsible person when
 
 
 6
 (A)(ii) a railroad line has been placed on a system diagram map as required under Section 10904 of this title, but the rail carrier owning such line has not filed an application to abandon such line under sections 10903 and 10904 of this title; and
 
 
 7
 (B) an application to purchase such line has been filed * * *.
 
 
 8
 Under Section 10904, each carrier must maintain a complete diagram of its rail system, including lines potentially subject to abandonment. ICC regulations provide that a line is placed in category 1 on the system diagram map if the carrier anticipates it will be the subject of an abandonment or discontinuance application within three years. All lines potentially subject to abandonment because of anticipated operating losses or excessive rehabilitation costs are placed in category 2. Lines for which an abandonment or discontinuance application is pending before the ICC are placed in category 3. All lines operated under the rail service continuation provisions of Section 10905 or other specified Sections are placed in category 4, and all other lines which the carrier owns and operates fall into category 5. See 49 C.F.R. Sec. 1121.20 (1981). As discussed above, the ICC will take jurisdiction of a feeder line proceeding when the line has been listed as an abandonment candidate on the carrier's system diagram map and when a feeder line application, rather than a notice of intent to file an application, has been filed prior to the filing of an abandonment application.[1]
 
 
 9
 The amended statute provides for feeder line jurisdiction when
 
 
 10
 (A)(ii) a railroad line is on a system diagram map as required under section 10904 of this title, but the rail carrier owning such line has not filed an application to abandon such line under sections 10903 and 10904 of this title before an application to purchase such line, or any required preliminary filing
 
 
 11
 with respect to such application, is filed under this section; and
 
 
 12
 (B) an application to purchase such line has been filed * * *.
 
 
 13
 Since the rail carrier in this case did not file an abandonment application until after the required preliminary filing--the notice of intent to purchase under the feeder line program--the amended statute would clearly provide feeder line jurisdiction here. The amended statute, however, did not go into effect until January 14, 1983; final ICC decisions on the Cisco line occurred in May 1982, and on the Bloomington line in July 1982. There is a retroactivity provision, which states that the amendment shall be effective with respect to
 
 
 14
 any application or preliminary filing with respect to which the Commission has made no final decision before May 1, 1982, except that such amendment shall not affect any line which has been removed from the carrier's system diagram map before the date of enactment of this Act [January 14, 1983], 96 Stat. 2554.
 
 
 15
 Although all apparently agree that the Commission did not take final action dismissing the notices of intent to purchase the lines until after May 1, 1982, they disagree over the interpretation of the phrase "removed from the carrier's system diagram map."
 
 
 16
 Under 49 U.S.C. Sec. 10904 and the applicable regulations, a carrier must list on its system diagram map all lines operated directly or indirectly. Thus read literally, the statutory requirement of removal from the carrier's system diagram map could only occur when the carrier actually abandoned a line and ceased to operate it. This literal reading clearly covers the Bloomington line: abandonment by ICG was authorized by this Court's stay order, and the line was actually removed from ICG's September 1982 system diagram map. The new amendment therefore is of no benefit to PACY in pursuing its claim to the Bloomington line because the amendment specifically states that it will not apply to lines which have been removed from the carrier's system diagram map before January 14, 1983.
 
 
 17
 However, the amendment could apply to the Cisco line under a literal reading of the retroactivity provision. The line still appears on the September 1982 system diagram map as a category 3 line for which abandonment or discontinuance applications are pending before the ICC (ICG Supp.Br.App. 2). But the May 11, 1982, decision granting the ICG abandonment application for the Cisco line was a final one unchallenged on this appeal. The issuance of the certificate was postponed because of Cisco's Section 10905 offer of financial assistance and the line therefore was not actually abandoned, but instead appears on the September system diagram map as subject to a pending abandonment proceeding.
 
 
 18
 By making the amendment partially retroactive, Congress obviously intended to affect decisions that were already administratively final--at least decisions that were finalized after May 1, 1982. However, the decisions that Congress intended to affect retroactively were decisions regarding the feeder railroad development program under Section 10910. Surely Congress did not intend to undo retroactively final decisions on abandonment applications, made under a separate statutory Section, which according to the oft-quoted legislative history of the Staggers Act, was not meant to be "supplanted" by the feeder railroad program. See H.R. Rep. No. 96-1430, 96th Cong., 2d Sess. 124, reprinted in 1980 U.S.Code Cong. & Ad.News, 3978, 4110, 4156. To effectuate this result, it is reasonable to read the retroactivity provision as not applying to a line for which a final decision granting abandonment has been issued by the ICC before January 14, 1983, even when actual abandonment has not taken place before that time.[2] Cf. Illinois Central Gulf Railroad Co.--Abandonment--in McLean, Woodford, Marshall, LaSalle, Lee, Ogle and Stephenson Counties, Illinois, Docket No. AB-43 (Sub-No. 100) (March 14, 1983) (although feeder line statute was amended to allow ICC jurisdiction over preliminary filings, abandonment program was not amended to allow dismissal of abandonment applications even when filed after the preliminary feeder program filing) (ICG Supp.Br.App. 3). Such an interpretation more appropriately integrates the feeder line and the abandonment programs than an interpretation requiring a retroactive reopening of a final decision to grant an abandonment application.
 
 
 19
 Since we hold that the amended statute is not applicable to these actions, it is necessary to examine the ICC decisions under the old statute to determine their validity. The ICC interpreted the feeder line statute to require the filing of an application for purchase under the feeder line program before the Commission could take jurisdiction of the case. 49 U.S.C. Sec. 10910. The ICC then applied a validly promulgated regulation requiring that a notice of intent to purchase under the feeder line program precede an application by 90 days. 49 C.F.R. Sec. 1128.2(a). Petitioners argue that the regulation as applied to the facts of this case violates the governing statute (Br. 21-25) and that the ICC interpretation of the statute as requiring an application to invoke feeder line jurisdiction is incorrect (Br. 20 and n. 3). We address these arguments in reverse order.
 
 
 20
 Petitioners admit that the statute requires an application to purchase before the ICC can require the sale of a line under the feeder program. But they argue that this merely means that feeder program jurisdiction is not finalized until such an application is on file; a preliminary notice of intent to purchase is, in their view, sufficient to invoke feeder program jurisdiction. Of course, once feeder program jurisdiction is invoked, it cannot be defeated by the subsequent filing of an abandonment application. See Indiana Hi-Rail Corp.--Feeder Line Acquisition, 366 I.C.C. 42 (1981).
 
 
 21
 The ICC in its May 10 decision specifically rejected petitioners' arguments. It interpreted the statutory application requirement as jurisdictional--since the ICC could not force a sale under the feeder program without an application being on file, it could not foreclose the filing of abandonment applications without a feeder program application being on file. We agree with the ICC's interpretation. A contrary interpretation would significantly interfere with the abandonment program prescribed under Section 10905. First, there is no time limit on the filing of a feeder application after a notice of intent to purchase is filed; and second, a person who files a notice of intent is under no obligation at all ever actually to file an application. If the filing of a notice of intent successfully forestalled the filing of an abandonment application, a carrier could be delayed indefinitely in filing an abandonment application, even though a feeder program application might never be filed.
 
 
 22
 Since the statute requires that an application be filed and there was no application filed by petitioners in this case, the above analysis should be dispositive. However, the petitioners argue that the reason they failed to file a feeder line application before ICG filed its abandonment application was because of an ICC regulation mandating the filing of a notice of intent 90 days before the filing of an application. Since the petitioners had to wait 90 days before filing an application, ICG was able to "interrupt" the feeder line proceeding by filing an abandonment application. Petitioners argue that the ICC should have interpreted the regulation in such a way as to allow the feeder line proceeding to continue.
 
 
 23
 It is true that the ICC regulation mandating a 90-day waiting period can have the effect of frustrating the feeder line program, and it is also true that the ICC has recognized this and modified the regulation. See Ex Parte No. 395 (Sub-No. 1), Feeder Railroad Development Program, 48 Fed.Reg. 9649 (March 8, 1983, effective April 7, 1983). But this effect was unforeseen, and we think that the regulation, at the time it was issued, was a reasonable interpretation of the statute. The purpose of the notice procedure in the feeder development regulations was to provide sufficient time for the parties to negotiate an acquisition agreement privately, thus eliminating the need for the ICC to commence formal proceedings for a forced sale under Section 10910. Section 10904 requires that a line be listed as an abandonment candidate for at least four months before a carrier can file an application for abandonment; a 90-day notice period under the feeder program, therefore, would not necessarily prevent a person from filing an application to purchase under the feeder development program before the carrier filed an abandonment application. Indeed, in this case, ICG placed the Cisco line in category 1 on its system diagram map on September 18, 1981, and it was not until more than 100 days later that Cisco filed its notice of intent to purchase the line under the feeder program. If Cisco had filed its notice earlier, the 90-day notice period could have run, and Cisco still could have filed a feeder program application before ICG was permitted by statute to file its abandonment application.
 
 
 24
 For the above reasons, we hold that the ICC regulation prescribing a 90-day notice period under the feeder program was a reasonable interpretation of the statute, and the decisions dismissing petitioners' notices of intent to file feeder line applications were not in violation of the governing statute and are therefore affirmed.
 
 
 25
 FAIRCHILD, Senior Circuit Judge, dissenting.
 
 
 26
 Considering the ICC decisions apart from the amendment enacted January 14, 1983, I think the ICC could and should have avoided the frustration of congressional intent produced in these cases by the ICC's 90-day regulation. Congress had guaranteed at the minimum a four-month "window" within which a feeder application to purchase could be filed and take precedence over an abandonment application. By requiring a notice of intent 90 days before an application to purchase, the ICC reduced the guaranteed "window" to one month unless it also treated the notice of intent as the commencement of a feeder purchase proceeding which would take precedence over an abandonment application for the next 90 days and a reasonable short period thereafter within which an application could be filed. In my opinion, the ICC had no authority to adopt the 90-day regulation unless it gave it the effect just suggested.[1]
 
 
 27
 In the amendment enacted January 14, 1983 Congress, itself, dealt with the problem arising from "any required preliminary filing." Congress, however, limited the retroactivity of this solution. Only one of the limitations concerns us here: the solution is inapplicable if the line "has been removed from the system's diagram map before the date of enactment of this act."
 
 
 28
 Perhaps the majority is correct in holding that the Bloomington line was actually, and should be treated as, removed from the system diagram map before that date because the abandonment was formally final (although it seems arguable that for this purpose it should be deemed not to have been removed from the map because physical destruction had been prohibited by this court's stay order). In any event, the Cisco line was still on the map. I think it is an unwarranted frustration of congressional intent to hold that although the Cisco line was still on the map, it really had been removed because its remaining on the map was the result of a different proceeding.
 
 
 
 [1]
 ICG argues that the ICC loses its jurisdiction under the feeder line program if an application for abandonment is filed at any time prior to a final decision on the feeder line application. However, in its May 10 decision dismissing Cisco's feeder line notice of intent, the ICC stated that it is "the filing of a feeder acquisition application, rather than the mere filing of a notice of intent to file the application, [that] is a necessary requirement for engaging the Commission's jurisdiction under 49 U.S.C. Sec. 10910." And under the ICC's holding in Indiana Hi-Rail Corp.--Feeder Line Acquisition, 366 I.C.C. 42 (1981), once such jurisdiction is invoked, a carrier cannot negate it simply by filing an abandonment petition. Id. at 44
 
 
 [2]
 According to ICC counsel at oral argument, the Commission was deadlocked on whether the phrase "remove from the system diagram map" meant removal of a line from categories 1 and 2--that is, removal of a line as an abandonment candidate. This case of course would be covered under such an interpretation; the amendment would not affect the Cisco line which was moved from category 1 to category 3 on the September 1982 ICG system diagram map. However, this interpretation would also cover a line that was removed from category 1 and placed in category 3 because of an abandonment application pending before the ICC but, unlike this case, not yet ruled on. We note here that when there has been no final decision on the abandonment application, but it was merely pending before the ICC on January 14, 1983, there does not appear to be any reason why the amendment should not apply
 
 
 [1]
 The opinion of the court refers to the 90-day regulation as an "interpretation of the statute." I am at a loss to know how it can be so classified