871 F.2d 702
 131 L.R.R.M. (BNA) 2097
 Patrick W. SIMMONS, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
and
KNRECO, Inc. d/b/a Keokuk Junction Railway and the Atchison,
Topeka and Santa Fe Railway Co., Intervenors.
 Nos. 87-2058, 87-3117 and 88-1998.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 28, 1988.
Decided April 7, 1989.
As Amended on Denial of Rehearing June 9, 1989.
 
 Gordon P. MacDougall, Washington, D.C., for petitioner.
 John D. Heffner, Gerst, Heffner & Foldes, Washington, D.C., for intervenors.
 Charles A. Strark, Office of the Gen. Counsel, ICC, Washington, D.C., for respondents.
 Before CUDAHY and MANION, Circuit Judges, and WILL, Senior District Judge.*
 CUDAHY, Circuit Judge.
 
 
 1
 Patrick Simmons, Illinois Legislative Director of the United Transportation Union, petitions for review of a series of orders of the Interstate Commerce Commission (the "ICC" or "Commission"). The ICC's decisions involve the railway acquisitions and operations of KNRECO, Inc., which operates under the name Keokuk Junction Railway ("KJ").
 
 
 2
 KJ first entered the railroad industry in 1981, when it purchased four miles of abandoned track from the bankruptcy trustee of the Chicago, Rock Island and Pacific Railroad (the "Rock Island"). On August 26, 1981, KJ filed a notice of exemption with the ICC, claiming that the purchase was exempt from ICC regulation under 49 U.S.C. sections 10901 and 11301, because the track was "spur track" under 49 U.S.C. section 10907(b)(1). See generally Illinois Commerce Comm'n v. United States, 779 F.2d 1270 (7th Cir.1985) (discussing "spur track" exemption, and criteria for determining whether particular track is exempted "spur"). On September 10, 1981, the ICC issued a notice stating that the track was indeed "spur", exempt from regulation by virtue of 49 U.S.C. section 10907. Keokuk Northern Real Estate Co. and Keokuk Junction Ry. Co.; Election of Exemption, 46 Fed.Reg. 45,220 (1981).
 
 
 3
 Five years later, KJ entered negotiations with the Atchison, Topeka and Santa Fe Railway (the "Santa Fe") to purchase approximately twenty-seven miles of Santa Fe track. However KJ found itself in a somewhat disadvantageous position in connection with this transaction. KJ's notice of exemption for the earlier Rock Island acquisition had allowed KJ to consummate that transaction without ICC approval. But the "spur track" exemption of section 10907 does not exempt a carrier from all federal regulation. Therefore, in its acquisition of the Santa Fe track, KJ would be considered a "carrier subject to ICC jurisdiction" for purposes of many statutory provisions administered by the ICC. Most importantly, KJ's acquisition would be subject to 49 U.S.C. section 11343, which generally requires the ICC to impose labor protective conditions on an acquisition transaction between two "carriers".
 
 
 4
 KJ found a way out of this bind, or so it thought. Although it had initially elected to exempt its purchase of the Rock Island track under the narrow "spur track" exemption of 49 U.S.C. section 10907, the KJ/Rock Island transaction was in fact entitled to an almost-total exemption from ICC regulation under the Feeder Railroad Development Program, 49 U.S.C. section 10910(g)(2), which had been enacted as part of the Staggers Rail Act of 1980. Under the broad section 10910 exemption, KJ would not be a "carrier subject to ICC jurisdiction" at all in connection with the Santa Fe transaction, and would therefore be free of the labor protective conditions which the ICC might otherwise impose.
 
 
 5
 Simmons intervened before the ICC, claiming that four union positions would be lost through the contemplated KJ/Santa Fe transaction. Simmons identified two legal obstacles purportedly standing between KJ and the desired "non-carrier" status. First, ICC regulations implementing another aspect of the feeder development program specifically prohibited the retrospective broadening of an election of exemption. 49 C.F.R. Sec. 1151.3(a)(12). If this provision applied to the KJ/Rock Island transaction, KJ would be forever bound by its 1981 election. Second, by claiming originally that the track it acquired from the Rock Island was "spur track," KJ had necessarily admitted that the four miles of track were not "line of railroad," at least as that term is used in 49 U.S.C. sections 10901 through 10906. And the feeder development program applies only to "railroad lines" or "lines of railroad" acquired under specified conditions. 49 U.S.C. Sec. 10910(g)(1), (g)(2). Therefore, Simmons claimed that KJ was adopting inconsistent positions in seeking to broaden its earlier election of exemption to take full advantage of the regulatory relief provisions of the Staggers Act.
 
 
 6
 With one commissioner dissenting, the ICC rejected Simmons' arguments. The Commission found that the regulations against broadening a previously filed exemption were not literally applicable to KJ and no policy would be served by extending the regulations beyond their explicit scope. The Commission also held that the distinction between "spur track" and "line of railroad" found in section 10907 should not be imported into the definition of "railroad line" or "line of railroad" under section 10910. Therefore KJ was entitled to broaden its prior election of exemption, and it remained a "non-carrier" for purposes of the Santa Fe acquisition. See KNRECO, Inc. d/b/a Keokuk Junction Ry. Co.; Acquisition and Operation Exemption; The Atchison, Topeka & Santa Fe Ry. Co.; Exemption, 52 Fed.Reg. 871 (1987) (notice of KJ's exempted acquisition of Santa Fe track).
 
 
 7
 Simmons also objected to another aspect of the proposed KJ/Santa Fe transaction. Subsequent to KJ's commencement of operations on the Santa Fe track, KJ and the Santa Fe entered into a "car haulage" agreement whereby the Santa Fe would haul KJ's cars over a further 85 miles of Santa Fe track. Simmons asserted that the car haulage contract was in reality a "trackage rights" agreement, and that under 49 U.S.C. section 11343(a)(6) the ICC was required to impose labor protective conditions on any trackage rights agreement entered into between rail carriers subject to ICC jurisdiction.
 
 
 8
 In two separate opinions, by three-to-two margins, the Commission once again rejected Simmons' arguments. The Commission found, first, that KJ was not a "carrier subject to ICC jurisdiction" at the time of the execution of the car haulage agreement, since the ICC had permitted KJ to broaden its election of exemption for the earlier Rock Island acquisition. Second, the ICC held that, in any event, the KJ/Santa Fe agreement was not a "trackage rights" agreement, because it did not give KJ the right to physically enter onto Santa Fe track.
 
 
 9
 Simmons petitions for review of the ICC's orders. He raises four issues: (1) whether KJ should have been allowed to broaden its initial election of exemption; (2) whether track which is "spur" under 49 U.S.C. section 10907 may also be "line of railroad" covered by the Feeder Railroad Development Program; (3) whether KJ was a "carrier subject to ICC jurisdiction" when it entered the car haulage agreement with the Santa Fe; and (4) whether the KJ/Santa Fe car haulage agreement was in fact a "trackage rights" contract, subject to mandatory labor protective conditions under 49 U.S.C. section 11343(a)(6). We do not agree with the ICC's reasoning in all respects, and we believe that some of the procedures employed by the Commission may have been overly summary. However, we have found no basis for invalidating the results reached by the Commission. The petitions for review are therefore denied.
 
 
 10
 It is important to recognize at the outset that it is not our function as a reviewing court to consider the issues raised by Simmons de novo. Instead, we must defer to the agency's interpretation of the statutes or regulations it administers "unless there are compelling indications that the Commission's interpretation is incorrect." Black v. I.C.C., 762 F.2d 106, 114-15 (D.C.Cir.1985); see generally Chevron, USA, Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984) (court must only ask whether agency action "is based on a permissible construction of the statute"); Geldermann, Inc. v. C.F.T.C., 836 F.2d 310, 315 (7th Cir.1987), cert. denied, --- U.S. ----, 109 S.Ct. 54, 102 L.Ed.2d 33 (1988). To the extent Simmons challenges the ICC's findings and conclusions in this case, we may overturn the agency's action only if it is "arbitrary and capricious." 5 U.S.C. Sec. 706(2)(A); see Central States Enters., Inc. v. I.C.C., 780 F.2d 664, 674 (7th Cir.1985); Illinois Cent. Gulf R.R. Co. v. I.C.C., 717 F.2d 408, 412 (7th Cir.1983).[1] With these deferential standards of review in mind, we proceed to a detailed consideration of Simmons' arguments.
 
 I.
 
 11
 The Staggers Rail Act of 1980[2] represents the most comprehensive overhaul of federal railroad regulation since the passage of the Interstate Commerce Act in 1887. Congress believed that the railroad industry was so hampered by the existing regulatory regime that its financial well-being had been jeopardized. Congress concluded that, while competing forms of transportation were subject to far less comprehensive or onerous oversight, the rail industry labored under a complex, burdensome and antiquated regulatory scheme. Much of this regulation was based on the economic realities of the nineteenth, rather than twentieth, centuries. The Staggers Act was meant to lift the industry's regulatory burden and generally to allow market mechanisms to play a larger role in governing such matters as railroad rates, mergers, acquisitions and line abandonments.[3] We must be guided by Congress' purposes but, needless to say, without loosening controls beyond the bounds of the Congressional authorization.
 
 
 12
 The Feeder Railroad Development Program, 49 U.S.C. section 10910, is an important part of the Congressional regulatory relief effort. The feeder program provides incentives for the purchase of light-density "branch lines" which have been abandoned, or which have deteriorated so significantly that a "de facto abandonment" has occurred. For present purposes, the most important aspect of the feeder program is that it provides entities acquiring eligible trackage with a blanket exemption from all ICC regulation under title 49 except the joint rate requirements.
 
 
 13
 The original version of the feeder program appeared in the House bill which ultimately became the Staggers Act. H.R. 7235, 96th Cong., 2d Sess. Sec. 502 (1980). Representative Madigan, the drafter of the original House version of the feeder development program, noted that existing law did not permit rail carriers to abandon undersirable rail lines at a time when other carriers would be willing to purchase and rehabilitate the line.
 
 
 14
 The pervasiveness of regulation of the railroad industry has become so great that slow motion abandonment has become the only option for a carrier to get out of a market it does not want. In other words, a carrier stops maintaining a light-density line and provides poorer and poorer service. Finally, the service gets so bad that most of the shippers on that line are driven away. Once most of the shippers are driven away, the railroad petitions the [ICC] for an abandonment. By the time the railroad has petitioned the Commission for abandonment the line is in such bad shape and the shippers so few that the Commission approves the abandonment.
 
 
 15
 126 Cong.Rec. 17,790 (1980). Representative Madigan summarized the advantages of the new feeder program as follows:
 
 
 16
 My amendment addresses the problem of deteriorating service on branch lines in several ways.
 
 
 17
 First, it provides a mechanism where a rail carrier must turn over a feeder line to a Government entity, short-line railroad, or a shipper group, for the constitutional minimum amount, if the line is scheduled for abandonment or if service upon a line is inadequate as determined by the Commission.
 
 
 18
 Second, it gives shippers the power to acquire the branch lines prior to the total deterioration of the service on such line.
 
 
 19
 Third, it provides incentives for the creation of short lines by giving them a special status under the act.
 
 Id. at 24,867.[4]
 
 20
 The Feeder Railroad Development Program reported by the House was ultimately adopted by the Senate in conference, with some amendments.[5] As originally adopted by the House, the feeder program had been entirely prospective in nature. However, in conference what became section 10910 was amended to cover railroad lines which had been abandoned in the 18-month period preceding adoption of the Staggers Act. 49 U.S.C. Sec. 10910(g)(2). This is the provision under which KJ acquired the Rock Island track. The legislative history does not explain why section 10910(g)(2) was adopted. However, Congress' motivations are not hard to discern. Prior to the adoption of the Staggers Act, the nation had witnessed two of the largest railroad reorganizations in history--the abandonment of the entire Rock Island system and the federally mandated restructuring of the Chicago, Milwaukee, St. Paul and Pacific Railroad.[6] In its recommendations on the Rock Island breakup, the ICC had observed that "viable portions" of the system could be salvaged, and that negotiations were then underway to purchase isolated, profitable segments of the line. 363 I.C.C. at 152. Several representatives remarked in their comments on the original version of the feeder development program that one defect was that the program did not cover abandonments then being supervised by bankruptcy courts.[7] It is clear that what became section 10910(g)(2) was meant to remedy this perceived shortcoming in the initial feeder program.[8]
 
 II.
 A.
 
 21
 Simmons first contends that KJ should have been prohibited from broadening its initial election of exemption, since the feeder program regulations bar such a revision. See 49 C.F.R. Sec. 1151.3(a)(12). However, the regulations which Simmons cites cover only the prospective aspect of the feeder program, and are therefore not literally applicable to this case. Further, we will not second-guess the policy judgments of the ICC, and therefore will not attempt to determine as a matter of policy whether KJ should be barred from expanding its previous election of exemption.
 
 
 22
 In the preamble to the Feeder Railroad Development Program regulations, the ICC emphasized that these rules, authorized by 49 U.S.C. section 10910(g)(1), did not govern the acquisition of rail lines acquired in the 18-month period immediately preceding the effective date of the Staggers Act (i.e., those lines whose acquisition is governed by section 10910(g)(2)).
 
 
 23
 [W]e should [ ] clarify the status of rail lines abandoned during the 18-month period preceding the effective date of the Rail Act and subsequently acquired by a financially responsible person. Some parties thought these lines qualified for the program. Under the provisions of the Rail Act, these lines are not eligible for acquisition under the program. However, they are eligible for exemption from the provisions of Title 49 of the United States Code ...
 
 
 24
 Ex Parte No. 395: Feeder R.R. Dev. Program, 365 I.C.C. 93, 100 (1981). Therefore, the prohibition against broadening a previously filed exemption contained in 49 C.F.R. section 1151.3(a)(12) is not literally applicable to this case.
 
 
 25
 Simmons argues that we should not read the ICC's regulations so narrowly. Instead, he argues that we should look to the purpose of the feeder program regulations, and find that the prohibition against "double dipping" is equally applicable to acquisitions under 49 U.S.C. section 10910(g)(2) as to acquisitions under subsection (g)(1). The majority of the ICC's feeder regulations deal with matters peculiar to the prospective aspect of the program; specifically, the rules establish procedures for determining whether service on a particular rail line has deteriorated to such an extent that a "de facto abandonment" has occurred. These regulations are not applicable here, since in order for an acquisition to be covered by subsection (g)(2) an actual, "de jure" abandonment must already have taken place. By contrast, 49 C.F.R. section 1151.3(a)(12), which prohibits broadening an exemption, is a less program-specific rule, and could easily be applied to section 10910(g)(2) acquisitions.
 
 
 26
 But it is not appropriate for this court to determine whether the policies underlying the ICC's feeder line regulations would be served by extending those regulations beyond their intended sphere of operation. As noted, our review of ICC orders is limited. If the ICC has violated its own regulations in a particular case, we would vacate the ICC's action as unlawful. However, where, as here, the ICC has acted in a case which is not covered by its regulations, the agency's discretionary authority is broader and our own review necessarily more confined. As indicated, our role is not to substitute our own policy judgments for those of the agency administering this highly technical statutory scheme; instead, we need only determine whether the agency's decisions are within the wide range of permissible actions.
 
 
 27
 We cannot conclude that the ICC's decision in this case is incorrect. The agency was entitled to find that KJ should not be prevented from taking full advantage of the regulatory relief provisions of the Staggers Act merely because of its 1981 decision to seek an exemption under section 10907, rather than section 10910(g)(2). In fact, a holding that KJ was forever barred from enjoying the benefits of the Staggers Act due to its earlier, narrow election of exemption seems unfair and hypertechnical.
 
 B.
 
 28
 Simmons argues that even if KJ was entitled to broaden a previously filed exemption, it was still inappropriate to grant KJ an exemption from regulation under section 10910(g)(2), since that section only covers transactions involving "railroad lines" or "lines of railroad." According to Simmons, KJ admitted that the Rock Island track was "spur" when it filed its 1981 election of exemption; if the track is "spur" under section 10907(b)(1), it cannot be "line of railroad" entitled to regulatory relief under the Staggers Act.
 
 
 29
 Section 10907(b)(1) exempts "spur" track from the coverage of sections 10901 through 10906, which generally regulate the acquisition, operation and abandonment of "lines of railroad" or "railroad lines." Section 10907 provides:
 
 
 30
 (b) The Commission does not have authority under sections 10901-10906 of this title over--
 
 
 31
 (1) the construction, acquisition, operation, abandonment, or discontinuance of spur ... tracks if the tracks are located, or intended to be located, entirely in one State.
 
 
 32
 Opinions of this and other courts, discussing whether track is "spur" exempted from regulation under sections 10901 through 10906, have generally stated the issue as whether the contested track is "spur" or "line of railroad." See, e.g., Illinois Commerce Comm'n v. United States, 779 F.2d 1270, 1271 (7th Cir.1985) (question for decision is "[w]hether railroad track is spur or railroad line"). However, this statement of the issue may reflect a usage which is misleading in the present context. Section 10907 does not say that "spur" track is not "line of railroad"--indeed, section 10907 appears to assume that "spur" is "line of railroad," which would be subject to ICC regulation under sections 10901 through 10906 but for the express exemption. Section 10907 is not definitional; instead, it exempts a subset of "railroad line" (namely "spur") from regulation to which it would otherwise be subject. Therefore, contrary to Simmons' arguments, section 10907 does not "define" "railroad line" in a manner inconsistent with the ICC's ruling in this case that track which constitutes "spur" under section 10907 may nonetheless be "line of railroad" under section 10910.
 
 
 33
 Even if section 10907 redefined "line of railroad" to exclude "spur", this definition only applies to sections 10901 through 10906. Clearly, Congress could have applied the section 10907 exemption to the feeder development program, but it chose not to do so. Simmons argues, however, that the feeder program was originally designed as an amendment to sections 10904 and 10906, and therefore the section 10907 exemption would have been applicable to the feeder program. We will not engage in an exercise in "what might have been." The feeder program underwent substantial revisions on the floor of the House and, to a more limited extent, in conference. It is impossible to discern any congressional intent to make the section 10907 exemptions applicable to the feeder program; and even if such an intent appeared, it is not clear that congressional intent could override the express language of the statute. Cf. In the Matter of Sinclair, 870 F.2d 1340 (7th Cir.1989).
 
 
 34
 In addition, there are good reasons why Congress might have chosen not to apply the section 10907 exemptions to the feeder program. The legislative history of the feeder development program indicates that Congress was concerned with deterioration of "branch lines," those low-density lines which primarily or exclusively served a relatively small number of shippers. Many of these lines presumably could be characterized as "spur" track. Under existing law, these tracks possess only a limited exemption from ICC regulation, and are also subject to state oversight. In the feeder program, Congress sought to provide broader incentives for the rescue of deteriorating low-density tracks by providing acquirers of "branch lines" with a virtually total exemption from regulation. Congress' regulatory relief effort would be frustrated if the very tracks most necessary to the isolated shipper, the "spur" tracks, could not be acquired and rehabilitated under the feeder program. It would also seem inconsistent for an entity which sought, for example, to acquire substantial portions of the failing Rock Island line to obtain a broad exemption from regulation for the main lines of the system, but then have to deal with a number of state regulatory bodies to acquire and operate the "spur" tracks necessary to make the system work. These policy considerations bolster our reading of the plain language of sections 10907 and 10910.
 
 III.
 
 35
 Having determined that the ICC properly exempted KJ's acquisition of the Rock Island track from regulation under 49 U.S.C. section 10910(g)(2), we next consider whether KJ's execution of a car haulage agreement with the Santa Fe was a "trackage rights" agreement subject to mandatory labor protective conditions under 49 U.S.C. section 11343(a)(6). Under the latter provision, labor protective conditions must be imposed by the ICC in any case of "acquisition by a rail carrier of trackage rights over ... a railroad line ... owned or operated by another rail carrier." See Railway Labor Executives' Ass'n v. United States, 339 U.S. 142, 70 S.Ct. 530, 94 L.Ed. 721 (1950) (Sec. 11343 requires minimum labor protective conditions in connection with any transaction covered by statute; ICC may impose more stringent protections where appropriate); Simmons v. ICC, 829 F.2d 150, 152-53 & n. 14 (D.C.Cir.1987); Black v. ICC, 762 F.2d 106, 110-11 (D.C.Cir.1985).
 
 A.
 
 36
 Section 11343 is specifically limited to "transactions involving carriers ... subject to the jurisdiction of the Interstate Commerce Commission." As one ground of its decision denying labor protective conditions in connection with the car haulage agreement, the ICC noted that KJ was not a carrier for purposes of section 11343, since its only previous acquisition (of the Rock Island track) had been exempted from ICC regulation under section 10910(g)(2). Where a carrier is exempt from ICC regulation under the feeder development program, it is not a "carrier subject to the jurisdiction of the [ICC]" for the purposes of later acquisitions otherwise subject to section 11343. We agree with the observations of the D.C. Circuit:
 
 
 37
 [Section] 11343 is plainly concerned not with new, non-carrier entities entering the railway market through limited acquisitions such as the one at issue here, but with transactions integrating two or more carriers and with the effect of multi-carrier transactions on competition.... [A]utomatically subjecting non-carrier purchasers of railway lines to the mandatory labor protection requirements of Sec. 11343 may well discourage such new entry into the rail market. Here, the Commission has determined that the unilateral exemption option in the feeder rail line development program, 49 U.S.C. Sec. 10910(g)(1), was intended by Congress to allow a program participant that otherwise is a "non-carrier" to preserve its "non-carrier" status for the purposes of Sec. 11343. The same legislative considerations supporting the statutory exemption option in Sec. 10910(g)(1) with respect to most of Title 49 in general support the exemption ... with respect to Sec. 11343 in particular. Given the several broad incentives contained in the feeder line development legislation, nothing in the Commission's construction of 49 U.S.C. Sec. 10910(g)(1) is inherently unreasonable.
 
 
 38
 Black v. ICC, 762 F.2d 106, 115 (D.C.Cir.1985) (citations and footnotes omitted). Although Black involved an acquisition under section 10910(g)(1), the same policy considerations apply to the acquisition of recently abandoned track under subsection (g)(2). If the provisions of the Staggers Act designed to encourage acquisition of recently abandoned lines are to be given full effect, an entity participating in the favored transactions should be allowed to retain its non-carrier status for purposes of section 11343 where its only prior railway acquisitions were exempt from regulation by virtue of section 10910(g)(2).
 
 
 39
 This exemption from mandatory labor protective conditions for what is concededly an operating railway is not boundless, however. A railway will only be considered a "non-carrier" under section 11343 so long as its prior acquisitions were exempt transactions under sections 10910(g)(1) or (g)(2). As Judge Oberdorfer observed in Black,The Commission's reading of section 10910(g) does not mean that [the exempt carrier] could build railroad empires outside of the Commission's scrutiny as [the Union] fears because once [the carrier] acquires a nonexempt line, it would become a carrier subject to Section 11343.
 
 
 40
 762 F.2d at 116 (citation omitted). As the ICC's attorney recognized at oral argument, KJ's acquisition of the Santa Fe track was not itself an exempt transaction under section 10910. Therefore, once KJ began operations on this track, it became a "carrier" subject to mandatory labor protective conditions for any further acquisitions of rail lines or trackage rights.
 
 
 41
 Simmons asserts that KJ commenced operations on the Santa Fe track on December 24, 1986, but entered the car haulage agreement at a later date. Therefore, even if KJ was a "non-carrier" when it acquired the Santa Fe track, it was a carrier when it executed the car haulage agreement, and the ICC could not refuse to impose labor protection.
 
 
 42
 In its decision refusing to impose labor protective conditions in connection with the car haulage agreement, the ICC found that
 
 
 43
 section 11343(a)(6) is inapplicable to [the car haulage] agreement because [KJ] was not yet a carrier and therefore an agreement between carriers for joint use of rail line was not involved. The status of parties as carriers or noncarriers at the time the Notice of Exemption was filed, rather than their future status, is controlling for purposes of determining whether a transaction involving those parties is between two carriers and, therefore, subject to section 11343.
 
 
 44
 KNRECO, Inc. d/b/a Keokuk Junction Ry. Acquisition and Operation Exemption--The Atchison, Topeka and Santa Fe Ry. Co., ICC Finance Docket No. 30918, mem. op. at 3-4 (Oct. 22, 1987). The ICC's notice of exemption for the car haulage agreement recognized that KJ and the Santa Fe entered the car haulage agreement subsequent to the initial notice of exemption. See Railroad Operations: KNRECO, Inc., d/b/a Keokuk Junction Ry.--Acquisition of Incidental Trackage Rights Over the Atchison, Topeka & Santa Fe Ry. Co., 52 Fed.Reg. 41,785, 41,785 (1987). And KJ's attorney admitted that KJ "consummated the [Santa Fe] acquisition on December 23 and initiated operations December 24, 1986," well before the execution of the car haulage contract. Reply to Petition to Revoke at 2, KNRECO, Inc. d/b/a Keokuk Junction Ry.--Acquisition and Operation Exemption--The Atchison, Topeka & Santa Fe Ry. Co., ICC Finance Docket No. 30918 (Apr. 6, 1987).
 
 
 45
 It is apparent that KJ and the Santa Fe engaged in two separate transactions: the first for acquisition of the 27-odd miles of track, and the second for haulage of KJ freight over a further 85 miles of Santa Fe track. The ICC was correct to note that KJ was not a "carrier" for purposes of the acquisition transaction, since KJ's status must be determined as of the time immediately preceding the transaction, rather than afterward. Alabama S. R.R. Co., Inc. and the Alabama Great S. R.R. Co.--Acquisitions, Operations & Trackage Rights--Exemption, 1 I.C.C.2d 298, 299 (1984); see also Railway Labor Executives' Ass'n v. I.C.C., 784 F.2d 959, 968-69 (9th Cir.1986). However, although KJ may have been a "non-carrier" for purposes of the Santa Fe acquisition, it was a "carrier" for the purposes of the separate, and subsequent, execution of the car haulage agreement since KJ had commenced operations on the acquired track before the car haulage agreement was executed. The Alabama Southern decision reasoned as follows in finding that "carrier" status should be determined as of the time immediately preceding the transaction at issue:
 
 
 46
 [Section 11343(a)(6) ] only governs trackage rights between rail carriers. A rail carrier for purposes of section 11343 is defined as a person providing railroad transportation for compensation. 49 U.S.C. 10102[ (20) ]. Since ASR presently provides no rail transportation services, it is not a carrier. Prior Commission cases holding that a new company acquiring a line but which has not yet commenced operations is a carrier for purposes of section 11343 jurisdiction because it will "become a carrier" are overruled as contrary to the plain statutory definition of rail carrier.
 
 
 47
 1 I.C.C.2d at 299 (emphasis added). As the emphasized portion of this passage indicates, an acquiring railroad becomes a "rail carrier" under 49 U.S.C. sections 10102(20) and 11343 as soon as it commences operations on the acquired line. Since, by KJ's admission, it had begun operation on the Santa Fe line at the time it executed the car haulage agreement, it had forfeited its "non-carrier" status before entering the haulage contract. We therefore turn to the ICC's alternative rationale for holding that the haulage agreement was not subject to mandatory labor protective conditions: the agreement was not a "trackage rights" agreement as that term is used in section 11343(a)(6).
 
 B.
 
 48
 We have recently defined a "trackage rights" agreement as follows:
 
 
 49
 A trackage rights agreement essentially grants rights to a carrier to operate trains over the grantor's track. Such an agreement may limit the use of the track by withholding permission to serve customers along the track, limiting service to specified points on the track or granting unimpaired rights to service points on the track.
 
 
 50
 Burlington N. R.R. Co. v. United Transp. Union, 862 F.2d 1266, 1269 (7th Cir.1988). " 'Trackage rights' ... involve continuing or permanent easements or licenses granted to a foreign carrier to operate over the tracks and right of way of another carrier." Chicago, R.I. & Pac. R.R. Co. v. Chicago, B. & O. R.R. Co., 437 F.2d 6, 10 (7th Cir.), cert. denied, 402 U.S. 996, 91 S.Ct. 2173, 29 L.Ed.2d 161 (1971). Other opinions generally define "trackage rights" agreements in similar fashion, as those contracts which provide one carrier with the right to physically enter upon the property of another carrier in order to operate its trains over the latter's tracks.[9]
 
 
 51
 Simmons correctly notes that the ICC has expanded this definition of "trackage rights" somewhat. In Soo Line R.R. Co.--Joint Use of Lines--Chesapeake and Ohio Ry. Co., ICC Finance Docket No. 30703 (Aug. 22, 1986), the Commission held that a trackage rights agreement existed between Soo and C & O, even though the track owner, C & O, was responsible for the actual operation of Soo's trains over the C & O track. Mem. op. at 6 ("The mere fact that C & O performs the physical operations as an agent for Soo does not disqualify the operation as trackage rights.").
 
 
 52
 In the present case the ICC recognized that it had expanded the definition of trackage rights in Soo; however, the Commission found that the KJ/Santa Fe agreement did not constitute trackage rights even under this broader understanding.
 
 
 53
 Trackage rights involves the operation of one carrier over the line of another. The holder of trackage rights need not perform the physical operation; it can contract for the performance of that operation by another party, including the carrier owning the line. However, there must be some indicia of the trackage rights holder's right to enter on another carrier's track to perform the rail service. In this instance, there is none. The entire movement of KJ's cars on the [Santa Fe] line will be handled by, and under the control of, [the Santa Fe]. Further, there is no indication that KJ will share in the maintenance costs of the [Santa Fe] line nor in the cost of moving its cars over that line. Rather, it will pay a charge for the haulage service provided by [Santa Fe].
 
 
 54
 We cannot construe [the Santa Fe's] handling of KJ's cars as a grant of permission for KJ to operate over the line. The [KJ/Santa Fe] agreement is merely a business arrangement pertaining to the movement of cars of one carrier by another. As such, it does not require our approval.
 
 
 55
 KNRECO, Inc., d/b/a Keokuk Junction Ry. Acquisition and Operation Exemption--The Atchison, Topeka & Santa Fe Ry. Co., ICC Finance Docket No. 30918, mem. op. at 2 (Apr. 12, 1988). The Commission specifically distinguished the Soo/C & O arrangement by noting:
 
 
 56
 While under the Soo/C & O agreement, Soo's motive power was used for all movements, here, [the Santa Fe], the owner of the line, furnishes the motive power. While the Soo/C & O agreement specifies that Soo's and C & O's trains will be kept separate, it does not appear that the cars of [KJ and the Santa Fe] will be kept separate.
 
 
 57
 KNRECO, Inc. d/b/a Keokuk Junction Ry. Acquisition and Operation Exemption--The Atchison, Topeka & Santa Fe Ry. Co., ICC Finance Docket No. 30918, mem. op. at 3 (Oct. 22, 1987).
 
 
 58
 Given the deferential standard under which we review ICC orders, we cannot hold that the Commission erred in finding that the KJ/Santa Fe agreement was sufficiently different from the Soo/C & O arrangement so that the former did not constitute "trackage rights." Clearly, in determining whether one carrier has been granted the right to use another carrier's tracks, it is important whether the former carrier will use its own locomotives, and send complete trains of its own cars over the other's tracks rather than have its cars intermixed with the owning carrier's cars. The distinctions drawn by the ICC between this case and Soo are credible and reasonable. Accordingly, we will not disturb the ICC's finding that the car haulage agreement at issue in this case did not constitute "trackage rights" for purposes of 49 U.S.C. section 11343(a)(6). We therefore conclude that the ICC was not required to impose labor protective conditions on KJ because of the car haulage contract.
 
 
 59
 Although what has been said to this point is sufficient to dispose of Simmons' petition for review as to the car haulage agreement, we take note of one troubling aspect of the Commission's handling of this case. Obviously, the Commission's determination that the KJ/Santa Fe agreement did not constitute "trackage rights" was based almost exclusively on the content of the contract between the parties. But the KJ/Santa Fe contract was never included in the record; in fact, when Simmons asked for a copy of the contract, the request was denied, since the Commission found that it could reasonably rely on KJ's summary of the agreement. It is difficult to understand how a tribunal can interpret a contract whose legal effect is disputed without having a copy of the document before it. Absent any indication that KJ misrepresented the terms of the contract, we hesitate to find the ICC's action "arbitrary and capricious" based on the denial of Simmons' discovery request; however we take this opportunity to express our concerns about the "rush to judgment" which apparently occurred in this case. See KNRECO, Inc. d/b/a Keokuk Junction Ry. Acquisition and Operation Exemption--The Atchison, Topeka & Santa Fe Ry. Co., ICC Finance Docket No. 30918, mem. op. at 3-4 (Apr. 12, 1988) (Commissioner Lamboley, joined by Commissioner Simmons, dissenting).
 
 IV.
 
 60
 For the foregoing reasons Simmons' petitions for review of the ICC's orders in this matter are
 
 
 61
 DENIED.
 
 
 
 *
 The Honorable Hubert L. Will, Senior District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 Simmons does not argue that 49 U.S.C. section 10327 requires the ICC to conduct an "on the record" hearing in order to make the decisions at issue here. We therefore do not decide whether "substantial evidence" review under 5 U.S.C. section 706(2)(E) might also be appropriate in this case. See Central States Enters., 780 F.2d at 673-74
 
 
 [2]
 Pub.L. No. 96-448, 94 Stat. 1895 (1980) (codified in scattered sections of 45 and 49 U.S.C.)
 
 
 [3]
 For an overview of the deregulatory impulses which guided Congress in its enactment of the Staggers Act, see generally Railway Labor Executives' Ass'n v. Pittsburgh & Lake Erie R.R. Co., 845 F.2d 420, 433-35 (3d Cir.1988); Illinois Commerce Comm'n v. I.C.C., 749 F.2d 875, 877 (D.C.Cir.1984) (Swygert, J.), cert. denied, 474 U.S. 820, 106 S.Ct. 70, 88 L.Ed.2d 57 (1985); Coal Exporters Ass'n v. United States, 745 F.2d 76, 80-82 (D.C.Cir.1984), cert. denied, 471 U.S. 1072, 105 S.Ct. 2151, 85 L.Ed.2d 507 (1985); Note, Fine-Tuning Deregulation: The Interstate Commerce Commission's Use of its General Rail-Exemption Power, 53 Geo.Wash.L.Rev. 827, 829-33 (1985)
 
 
 [4]
 See also id. at 17,794 (question and answer form prepared by Rep. Madigan) (feeder program will permit the purchase of "railroad lines which are scheduled for abandonment ... or rail lines on which the carriers have allowed a service deterioration, i.e., a de facto abandonment"); id. at 17,797 (remarks of Rep. Staggers); id. at 24,867 (statement of Rep. Florio); H. Rep. No. 1035, 96th Cong., 2d Sess. 43-44, reprinted in 1980 U.S.Code Cong. & Admin.News 3978, 3988-89 (feeder program "creates a method for transferring the rail properties prior to their downgrading," to the parties "who have the greatest incentive for maintaining the quality of the line and the service--the shippers on the line and the State assisting those shippers"); id. at 71-72, 1980 U.S.Code Cong. & Admin.News at 4016-17
 
 
 [5]
 H.Conf.Rep. No. 1430, 96th Cong., 2d Sess. 124, reprinted in 1980 U.S.Code Cong. & Admin.News 4110, 4156-57; see also 126 Cong.Rec. 28,23 2-33 (1980) (statement of Sen. Cannon) (reporting adoption of feeder program in conference). The program was enacted into law as section 401 of the Staggers Act. See Pub.L. No. 96-448, 94 Stat. 1895, 1939-41 (1980) (codified as amended at 49 U.S.C. Sec. 10910)
 
 
 [6]
 See Chicago, Rock Island & Pac. R.R. Co., Debtor (William M. Gibbons, Trustee)--Abandonment--Entire System, 363 I.C.C. 150 (1980) (ICC recommendations to bankruptcy court supervising abandonment of Rock Island system); Milwaukee Railroad Restructuring Act, Pub.L. No. 96-101, 93 Stat. 736 (1979) (codified in scattered sections of 45 and 49 U.S.C.)
 
 
 [7]
 See, e.g., 126 Cong.Rec. 17,797 (1980) (statement of Rep. Staggers) (noting that "the feeder program is not applicable to railroads in reorganization, although clearly it is the intent of Congress that such railroads should seek purchasers of lines they propose to abandon"); H.Rep. No. 1935, 96th Cong., 2d Sess. 44, reprinted in 1980 U.S.Code Cong. & Admin.News 3978, 3989 (noting "the recent bankruptcies of the Milwaukee Road and the Rock Island, and the service disruptions that have been caused by the forced restructuring of those systems")
 
 
 [8]
 For other accounts of the legislative history of the feeder development program, see Black v. I.C.C., 762 F.2d 106, 114 (D.C.Cir.1985); Simmons v. I.C.C., 697 F.2d 326, 339-40 (D.C.Cir.1982). This court has dealt with issues arising out of the operation of the feeder program on two prior occasions. Prairie Cent. Ry. Co. v. I.C.C., 728 F.2d 907 (7th Cir.1984); Cisco Co-op. Grain Co. v. I.C.C., 717 F.2d 401 (7th Cir.1983)
 
 
 [9]
 See, e.g., Illinois Commerce Comm'n v. I.C.C., 819 F.2d 311, 312 (D.C.Cir.1987) ("Trackage rights agreements are arrangements by which one railroad company allows another to use its railroad tracks."); Brotherhood of Locomotive Eng'rs v. I.C.C., 808 F.2d 1570, 1572 n. 3 (D.C.Cir.1987); In the Matter of Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 784 F.2d 831, 832 (7th Cir.1986) (trackage rights agreement generally grants contracting party "the right to operate trains" over the tracks of another railroad)