825 F.2d 1121
 26 ERC 1572, 17 Envtl. L. Rep. 21,097
 CITY OF EVANSTON, a municipal corporation, Joan W. Barr, Ann
Rainey and Norris Larson, Plaintiffs-Appellants,
v.
REGIONAL TRANSPORTATION AUTHORITY, a municipal corporation,
et al., Defendants- Appellees.
 No. 86-2113.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 1, 1986.
Decided July 10, 1987.*
 
 Jack M. Siegel, Siegel & Warnock, Chicago, Ill., for plaintiff-appellant.
 Harvey Schwartz, Schwartz, Zaban & Jacobs, Chicago, Ill., for defendants-appellees.
 Before BAUER, Chief Judge, WOOD, Circuit Judge, and PELL, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 The City of Evanston, its mayor, and two aldermen brought suit seeking injunctive and declaratory relief in order to block the funding, purchase, and use of property at 2424 Oakton Street in Evanston, Illinois, as a bus maintenance facility. The defendants to the suit are the Regional Transportation Authority ("RTA"), the Suburban Bus Division of the RTA (known as "PACE"), the National Steel Service Center, Inc. ("National"), and the Urban Mass Transportation Administration ("UMTA"), an agency of defendant United States Department of Transportation ("DOT"). The property in question was previously owned by National, and used as a manufacturing facility. The RTA received a federal grant from UMTA for the purpose of acquiring the property.
 
 
 2
 The district court on June 27, 1986, granted the defendants' motions to dismiss the complaint, finding that the plaintiffs had failed to allege the requisite standing to invoke the district court's jurisdiction. The plaintiffs appealed, arguing that the dismissal was improper.
 
 
 3
 Because this is an appeal of a granted motion to dismiss, the allegations of fact in the complaint are taken to be true. Doe v. St. Joseph's Hospital, 788 F.2d 411, 414 (7th Cir.1986); Ellsworth v. City of Racine, 774 F.2d 182, 184 (7th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986). These facts, however, will be discussed only as they are necessary to the discussion of the issues.
 
 I. JURISDICTIONAL ISSUES
 
 4
 The plaintiffs claimed in their complaint that the district court had federal question jurisdiction under 28 U.S.C. Secs. 1331, 2201, based on the Urban Mass Transportation Systems Act, 49 U.S.C. Sec. 1601 et seq. ("UMT Act") and the National Environmental Policy Act, 42 U.S.C. Sec. 4321 et seq. ("NEPA"). Additionally, in opposition to defendants' motions to dismiss and on appeal, the plaintiffs alleged jurisdiction under the Administrative Procedure Act, 5 U.S.C. Sec. 702.
 
 
 5
 The district court, addressing only those bases of jurisdiction that appeared on the face of the plaintiffs' complaint, found that the plaintiffs lacked standing to bring suit under the UMT Act or NEPA because neither statute created a private right of action. Moreover, the district court ruled that the individual plaintiffs had no standing to sue as taxpayers because the disputed decision was not an exercise of congressional power but was made by the executive branch.
 
 
 6
 The plaintiffs argue that the allegations of their complaint, if taken as true, establish that the plaintiffs have standing to challenge the use of federal funds to install a facility which they believe is highly detrimental to the environment and health and safety of the city and its citizens.
 
 
 7
 Article III of the Constitution restricts the power of the federal judiciary to the resolution of "cases" and "controversies." Diamond v. Charles, 476 U.S. 54, 106 S.Ct. 1697, 1703, 90 L.Ed.2d 48 (1986); Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 471, 102 S.Ct. 752, 757-58, 70 L.Ed.2d 700 (1982); Flast v. Cohen, 392 U.S. 83, 94-101, 88 S.Ct. 1942, 1949-53, 20 L.Ed.2d 947 (1968); see also Northside Sanitary Landfill v. Thomas, 804 F.2d 371, 380-81 (7th Cir.1986). The concept of a party's standing to bring suit "is a component of the case-or-controversy requirement and, as such, bears on the power of a court to entertain a party's claim." Id. at 380-81; Valley Forge, 454 U.S. at 471, 102 S.Ct. at 757-58.
 
 
 8
 In order for a party to have standing to bring suit in federal court, three requirements must be met: (1) the party must personally have suffered an actual or threatened injury caused by the defendant's allegedly illegal conduct, (2) the injury must be fairly traceable to the defendant's challenged conduct, and (3) the injury must be one that is likely to be redressed through a favorable decision. Valley Forge, 454 U.S. at 472, 102 S.Ct. at 758-59. "Neither the Administrative Procedure Act, nor any other congressional enactment, can lower the threshold requirements of standing under Art. III." Id. at 487-88 n. 24, 102 S.Ct. at 766-67 n. 24.
 
 
 9
 Beyond the constitutional requirements, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing. Thus, this Court has held that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Seldin, 422 U.S. [490,] 499 [95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) ]. In addition, even when the plaintiff has alleged redressable injury sufficient to meet the requirements of Art. III, the Court has refrained from adjudicating "abstract questions of wide public significance" which amount to "generalized grievances," pervasively shared and most appropriately addressed in the representative branches. Id., at 499-500 [95 S.Ct. at 2205-06]. Finally, the Court has required that the plaintiff's complaint fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Association of Data Processing Service Orgs. v. Camp, 397 U.S. 150, 153 [90 S.Ct. 827, 830, 25 L.Ed.2d 184] (1970).
 
 
 10
 Valley Forge, 454 U.S. at 474-75, 102 S.Ct. at 760 (footnotes omitted).
 
 A. Standing Under the UMT Act
 
 11
 The UMT Act does not create a private right of action, and none can be implied.
 
 
 12
 In determining whether a private right of action can be implied, a court must look to the intentions of Congress in enacting the statute. Merrill Lynch, Pierce, Fenner & Smith v. Curran, 456 U.S. 353, 377-78, 102 S.Ct. 1825, 1838-39, 72 L.Ed.2d 182 (1982); Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). If the language of the statute and its legislative history do not indicate that the statute was intended to benefit a particular class of persons, then the court need not consider other factors. California v. Sierra Club, 451 U.S. 287, 297-98, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101 (1981).
 
 
 13
 The Supreme Court has drawn a distinction between statutes whose language focuses on a right granted to a benefitted class of persons--where a private cause of action is generally found--and statutes framed as a "general prohibition or command to a federal agency"--where a cause of action is seldom implied.
 
 
 14
 Rapid Transit Advocates v. Southern California Rapid Transit District, 752 F.2d 373, 376 (9th Cir.1985). Compare Universities Research Association v. Coutu, 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981) (no private right of action under Davis-Bacon Act) with Cannon v. University of Chicago, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (Court found private right implied by Title IX of the Education Amendments of 1972).
 
 
 15
 Several courts that have considered the issue concluded that
 
 
 16
 [n]either the language nor the legislative history of the UMT Act suggests that the Act was intended to create federal rights for especial benefit of a class of persons but rather was intended to benefit the public at large through a general regulatory scheme to be administered by the Secretary of Transportation.
 
 
 17
 Lloyd v. Illinois Regional Transportation Authority, 548 F.Supp. 575, 586 (N.D.Ill.1982); see also Rapid Transit Advocates, 752 F.2d at 377; Associated Businesses of Franklin v. Warren County Board, 522 F.Supp. 1015, 1018-20 (S.D.Ohio 1981); Dopico v. Goldschmidt, 518 F.Supp. 1161, 1172-73 (S.D.N.Y.1981), aff'd in part, rev'd in part, 687 F.2d 644 (2d Cir.1982). We agree with these courts.
 
 
 18
 Section 1602(d) of the UMT Act requires that an applicant for a federal grant or loan shall certify that it has provided notice and an opportunity for public hearings and has held such hearings, "unless no one with a significant economic, social, or environmental interest in the matter requests a hearing." 49 U.S.C. Sec. 1602(d)(1). Additionally, the applicant must certify that it has considered the economic, social, and environmental impacts of the project and has found that the project comports with official development plans. 49 U.S.C. Sec. 1602(d)(2), (3). This language does not create rights for a benefitted class of persons; it simply outlines information that an applicant must supply to the Secretary of Transportation as a condition to receiving a grant or loan. The committee report on Sec. 1602(d) supports this interpretation. The committee noted that it "believe[d] that major federally assisted projects in urban areas should reflect full consideration of social and environmental, as well as economic, effects, and that affected citizens should participate effectively in local decision-making." H.R.Rep. No. 1264, 91st Cong., 2d Sess. reprinted in, 1970 U.S.Code Cong. & Admin.News 4092, 4097. However, the committee was concerned that "in many instances a public hearing would serve merely to delay proposed projects, which are already time consuming because of the numerous local and Federal actions involved in carrying out complex projects." Id. The committee suggested that the DOT should "exercise special care in framing regulations which carry out the intent of this requirement without unduly burdening local officials." Id. This legislative history indicates that Congress was interested in ensuring that local officials consider the local effects of their decisions, but not at the expense of delaying projects unduly.
 
 
 19
 Neither the statutory language itself nor the committee report offers support for the plaintiffs' right to sue under the statute. Therefore, the plaintiffs cannot proceed under the UMT Act.
 
 B. Standing Under NEPA
 
 20
 Plaintiffs have routinely obtained review of their NEPA claims under the Administrative Procedure Act, 5 U.S.C. Sec. 702. See, e.g., United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); Port of Astoria v. Hodel, 595 F.2d 467 (9th Cir.1979); Realty Income Trust v. Eckerd, 564 F.2d 447 (D.C.Cir.1977); Robinson v. Knebel, 550 F.2d 422 (8th Cir.1977); City of Rochester v. United States Postal Service, 541 F.2d 967 (2d Cir.1976). In these cases, the plaintiffs successfully sought to require the defendants to take a "hard look," through the preparation of an environmental impact statement ("EIS"), at the environmental consequences of their proposed actions. Plaintiffs here seek the same result.
 
 
 21
 In accordance with NEPA, 42 U.S.C. Sec. 4332(2)(C), all agencies of the federal government shall "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" a detailed statement (the EIS) concerning the environmental impact of the proposed action and related matters. As we have previously held, however, no EIS need be prepared where the proposed action will not significantly affect the quality of the environment. River Road Alliance v. Corps of Engineers, 764 F.2d 445, 449 (7th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1283, 89 L.Ed.2d 590 (1986); City of West Chicago v. United States Nuclear Regulatory Commission, 701 F.2d 632, 647-48 (7th Cir.1983).
 
 
 22
 The Council on Environmental Quality ("CEQ"), established by Title II of NEPA, 42 U.S.C. Secs. 4341-4347, has promulgated regulations governing agency compliance with NEPA. The CEQ has established uniform procedures for all federal agencies to use in determining whether, when, and how to prepare an EIS. 40 C.F.R. Secs. 1500-1517. Additionally, federal agencies are directed to adopt their own supplemental procedures as necessary. 40 C.F.R. Sec. 1507.3(a) (1978). In response to this directive, UMTA and the Federal Highway Administration ("FHWA") have promulgated regulations at 23 C.F.R. Sec. 771.101-.137 and 49 C.F.R. Sec. 662.101 to implement NEPA and the CEQ procedures.
 
 
 23
 The CEQ requires that the agencies adopt specific criteria for and identification of three classes of agency action. 40 C.F.R. Sec. 1507.3(b) (1978). Class I projects include actions that may significantly affect the environment and thus require an EIS. Class II projects, termed "categorical exclusions," include actions which normally do not have a significant effect on the environment and thus would not require an EIS or environmental assessment.[1] Class III projects are those in which the environmental impact cannot be initially determined. For Class III projects, the agencies must prepare an environmental assessment to determine whether an EIS is required.
 
 
 24
 Consistent with the CEQ's classification procedures, the UMTA/FHWA regulations enumerate twenty-nine categorical exclusions. 23 C.F.R. Sec. 771.115(b)(1)-. 115(b)(29) (1986). Categorical exclusions are defined as "categories of actions which do not involve significant environmental impacts or substantial planning, time or resources. These actions will not induce significant foreseeable alterations in land use, planned growth, development patterns, or natural or cultural resources." 23 C.F.R. Sec. 771.117(a) (1980). The categorical exclusion most applicable to this controversy reads as follows:
 
 
 25
 Construction of new bus storage and maintenance facilities in areas used predominantly for industrial or transportation purposes where such construction is not inconsistent with existing zoning and located on or near a street with adequate capacity to handle anticipated bus and support vehicle traffic.
 
 
 26
 23 C.F.R. Sec. 771.115(b)(25) (1986).
 
 
 27
 The plaintiffs allege in their complaint that the City of Evanston has requested UMTA to undertake an environmental study and provide an EIS. According to the complaint, UMTA has refused to do so, because it considers the project to be a "categorical exclusion" from NEPA's requirement that the agency prepare an EIS. The plaintiffs assert that UMTA made the wrong decision, that the proposed bus garage is not properly excludable from the EIS requirement.
 
 
 28
 The complaint alleges that the property at 2424 Oakton Street is currently used as a steel business and is zoned for the M-4 Manufacturing District. The complaint also alleges that the use of the property as a bus garage is not consistent with the comprehensive plans for the area and requires a special use permit.[2]
 
 
 29
 The complaint on its face creates a problem in these particular circumstances. Considering the present steel business use in light of nothing but some vague and general allegations of environmental harms, we cannot see why or how the new proposed use will not in fact be an environmental improvement. This case does not arise in a vacuum. The property is not a vacant lot. The existing use, a steel business, is not without considerable environmental impact of its own. In these circumstances the plaintiffs' complaint must clearly articulate a "distinct and palpable" injury in fact, within the zone of interests which NEPA protects, that will result from the property's conversion from a steel manufacturing business, not ordinarily considered an environmental benefit, to a bus garage. See Warth v. Seldin, 422 U.S. at 501, 95 S.Ct. at 2206 (1975). Ordinarily, one would not consider a bus garage, in the typical location, to be environmentally detrimental, and UMTA/FHWA regulations therefore categorically exclude bus garages from the EIS requirement of NEPA. The plaintiffs do not suggest how or why the bus garage will generate more traffic than the going steel business, or that the character of the traffic, buses instead of trucks, will have some significant impact. The plaintiffs do not suggest how or why pollution, noise, or other supposed adverse environmental impacts will be increased by reason of the change from a steel business to a bus garage. It is, of course, not necessary to plead evidence, but in these particular circumstances the plaintiffs must provide some suggestion that this change causes particular and specific adverse environmental consequences affecting these plaintiffs.
 
 
 30
 The plaintiffs must demonstrate "that their environmental concerns are not so insignificant that they ought to be disregarded altogether." Robinson v. Knebel, 550 F.2d 422, 425 (8th Cir.1977).
 
 
 31
 As far as we can tell, the current use of the property as a steel manufacturing business has been acceptable to the plaintiffs. They have not claimed that the steel business is a nonconforming use. They do not suggest why or how the property's use as a bus garage would be inharmonious with the current zoning classification, M-4 Manufacturing, regardless of how the zoning ordinance has been manipulated during this controversy. The plaintiffs do not suggest any reason why the categorical exclusion should not apply.
 
 
 32
 The two alderman plaintiffs do not sufficiently allege where they live in relation to the property. Moreover, they have failed to allege in a concrete or particular way how they will be adversely affected because of the change in use, even if they live across the street. See City of Davis v. Coleman, 521 F.2d 661, 671 (9th Cir.1975) (plaintiff must have "a sufficient geographical nexus to the site of the challenged project"). They have demonstrated no personal stake in the change of use. Warth v. Seldin, 422 U.S. at 501, 95 S.Ct. at 2206-07; Barlow v. Collins, 397 U.S. 159, 164-65, 90 S.Ct. 832, 836-37, 25 L.Ed.2d 192 (1970); Data Processing Service Organizations v. Camp, 397 U.S. 150, 152-57, 90 S.Ct. 827, 829-32, 25 L.Ed.2d 184 (1970).
 
 
 33
 Nor do the City and its mayor allege specifically in a concrete and particularized way how the bus garage use will be more detrimental than the steel business. They do not allege sufficiently how some conjectured decline in property values and loss of tax revenues, even if considered to be within the zone of protected interests, will result from the change of use. The complaint is framed in general boilerplate language which demonstrates no specific relation of these plaintiffs to this piece of property. Standing is not conferred under NEPA merely because plaintiffs generally disfavor a proposed use of a particular piece of property, if they do not allege some distinct injury in fact to their environmental interests. See Glass Packaging Institute v. Regan, 737 F.2d 1083, 1091 (D.C.Cir.), cert. denied, 469 U.S. 1035, 105 S.Ct. 509, 83 L.Ed.2d 400 (1984). Plaintiffs have not sufficiently demonstrated that they have standing to bring a claim under NEPA.
 
 C. Taxpayer Standing
 
 34
 Plaintiffs lack taxpayer standing. Taxpayer standing is limited to challenges directed at congressional actions. Valley Forge Christian College v. Americans United for Separation of Church and State, 454 U.S. 464, 479, 102 S.Ct. 752, 762, 70 L.Ed.2d 700 (1982); Schlesinger v. Reservists Committee to Stop the War, 418 U.S. 208, 228, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974); Flast v. Cohen, 392 U.S. 83, 102, 88 S.Ct. 1942, 1953-54, 20 L.Ed.2d 947 (1968). The plaintiffs' challenge is to the use of federal funds provided to the RTA by UMTA. This grant of federal funds is an action undertaken by the executive branch, involving no congressional action.
 
 II. CONCLUSION
 
 35
 The plaintiffs cannot bring suit under the UMT Act because it created no private right of action and none is implied. The plaintiffs have failed to demonstrate sufficiently that they have standing to bring a claim under NEPA. The plaintiffs have no standing as taxpayers to challenge an action by the executive branch. Therefore, the district court's order dismissing the plaintiffs' complaint is
 
 
 36
 AFFIRMED.
 
 
 
 *
 The typescript opinion we issued on July 10 is now presented in printed form
 
 
 [1]
 An "environmental assessment" is a concise public document prepared by the agency which provides, among other things, the evidence and analysis the agency used in determining whether an action will have a significant impact and therefore require an EIS. 40 C.F.R. Sec. 1508.9 (1978)
 
 
 [2]
 The Agreement of Sale, attached to the complaint as Exhibit B, indicates that during the course of negotiations leading to the agreement the City of Evanston amended its zoning ordinance to change the use of the property as a bus garage from a permitted use to a special use