**Patrick W. SIMMONS, Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**

**and**

**Chicago–Chemung Railroad Corporation, Intervening Respondent.**

**No. 88–3207.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 14, 1989.

Decided April 16, 1990.

Opinion on Denial of Rehearing and Rehearing En Banc Aug. 2, 1990.

---

Gordon P. MacDougall, Washington, D.C., John J. Naughton, Henslee, Monek & Henslee, Chicago, Ill., for petitioner.

Stuart F. Gassner, Myles L. Tobin, Chicago Northwestern Railway Co., Law Dept., Chicago, Ill., for intervenor.

Thomas F. McFarland, Jr., ·Belnap, Spencer, McFarland, Emrich & Herman, Anton R. Valukus, Asst. U.S. Atty., William Redmond, I.C.C., Chicago, Ill., Virginia Strasser, I.C.C., Edwin Meese, U.S. Atty. Gen., Dept. of Justice, Civil Div., Appellate Section, Catherine G. O'Sullivan, David Seidman, Dept. of Justice, Antitrust Div., Appellate Section, Washington, D.C., for respondents.

Before CUMMINGS, FLAUM, and MANION, Circuit Judges.

MANION, Circuit Judge.

Petitioner Patrick W. Simmons[1] has asked this court to review the action of the Interstate Commerce Commission (ICC), which declined to revoke a class exemption pertaining to the sale of Chicago and North Western Transportation Company's (C & NW's) Harvard–Chemung railroad line. For reasons which follow, the petition is dismissed for lack of standing.

## I. BACKGROUND

For a number of years, C & NW has sought to abandon its Illinois line between Harvard and South Beloit, Wisconsin, a distance of 23.4 miles. C & NW filed its first abandonment application on March 31, 1981, contingent upon its acquiring track rights over a line owned by Chicago, Milwaukee, St. Paul and Pacific Railroad Company (MILW) between Clinton Junction and Beloit, Wisconsin. A number of shippers filed protests. C & NW withdrew its application when MILW indicated it would abandon the Clinton Junction–Beloit line. C & NW next filed for abandonment of the Harvard–South Beloit line on April 21, 1987, again encountering substantial opposition. C & NW again withdrew its application. In permitting C & NW to withdraw its abandonment request for the second time, the ICC stated that in the future C & NW would be required to comply with the system diagram map provisions, and file a notice of intent and updated evidence in any new abandonment application.

Rather than file a new application for abandonment of the Harvard–South Beloit line, C & NW instituted a series of transactions. These efforts were: (1) the transfer of the eastern 3.5–mile Harvard–Chemung segment for operation by Chicago–Chemung Railroad Corporation (CCRC); (2) use of the out-of-service class abandonment exemption to secure automatic abandonment of the adjoining middle 6.5–mile Chemung–Poplar Grove segment; and (3) an-

---

**1.** Simmons is the Legislative Director of the United Transportation Union (UTU), some members of which are alleged to work for C & NW. Simmons does not even have putative standing to sue as an individual; he apparently intended to sue on behalf of the UTU. We therefore will treat Simmons as if he sued in an official capacity. *United Transportation Union v. ICC,* 891 F.2d 908, 909 n. 1 (D.C.Cir.1989). Since Simmons frequently litigates these matters, in the future he should file in the name of the appropriate party.

nouncement of a forthcoming application to abandon the remaining western 3.4–mile Poplar Grove–South Beloit segment.

CCRC filed a notice with the ICC on September 16, 1987 that it intended to acquire the Harvard–Chemung segment pursuant to an acquisitions exemption adopted by the ICC in 1985. The ICC adopted the exemption pursuant to 49 U.S.C. § 10505(a) for all § 10901 sales of a rail line to a new carrier. *Class Exemption for the Acquisition and Operation of Rail Lines Under 49 U.S.C. § 10901*, 1 I.C.C.2d 810 (1985), *aff'd sub nom, Illinois Commerce Commission v. ICC*, 817 F.2d 145 (D.C.Cir. 1987). Patrick Simmons, in his capacity as the Illinois Legislative Director of the UTU, filed a petition on September 21, 1987 asking the ICC to stop the acquisition. Simmons made allegations concerning the effect of the sale on C & NW employees; he asserted inefficiency of a 3.5–mile operation; CCRC's viability; the impact on future service by C & NW to shippers located at Poplar Grove; CCRC's relationship to the primary shipper on the line, Seegers Grain Company; and Seegers' concentration of market power vis-a-vis rival grain elevators located on C & NW's line beyond Chemung. The ICC declined to issue an administrative stay, denied Simmons' discovery requests, and declined to revoke the exemption for the line.

With respect to CCRC's operation of the line, the ICC observed that "the line is earning an operating profit, notwithstanding its low traffic volume, and that the traffic volume will increase, perhaps significantly" due to Seegers' projected additional thousand carloads per year. The Commission stated:

> Simmon's [sic] generalized challenge to the efficiency and viability of short line railroads is not supported by the history of the shortline railroad industry or the facts of this case. It has been our experience that the acquiring firm brings new vitality to the line. Typically, the new operator has closer ties to local communities, will provide better service, and works closely with the line's shippers.

Decision Denying Petition to Revoke, at 3 (March 14, 1988).

Next, the ICC considered Simmons' argument that the sale of the Harvard–Chemung segment would remove any incentive for C & NW to repair the Poplar Grove–Chemung segment, leaving the Poplar Grove shippers with a more circuitous routing to Chicago than they have been using. The ICC considered it unlikely that C & NW would repair the Poplar Grove–Chemung segment whether or not it retained the Harvard–Chemung segment, considering C & NW's operating losses on the Poplar Grove–Chemung segment. Moreover, the ICC considered the increased mileage for the Poplar Grove traffic to be modest and not likely to jeopardize the quality of service.

The ICC saw no reason to believe that shippers on the Harvard–Chemung line would be adversely affected by the acquisition. The ICC dismissed Simmons' argument that Seegers' control of CCRC would result in a concentration of market power that would adversely affect rival off-line shippers. The ICC noted that rival shippers will continue to be served directly by C & NW and will look to C & NW for competitive rates to Chicago. The ICC noted CCRC's affiliation with Seegers through a small group of common stockholders, but further noted that the mere ownership of a railroad by its principal on-line shipper is not prohibited by 49 U.S.C. § 10746, commonly referred to as the "commodities clause." While the statute would not permit CCRC to operate as an alter ego of Seegers, the ICC found no indication that this is the case and saw no reason to investigate further.

Finally, the ICC addressed Simmons' claims that members of the UTU would be injured by the sale:

> Simmons claims that CNW employees will be adversely affected and irreparably injured by the loss of jobs, but he does not provide specific details as to the number of employees affected, if any, or the nature of the effect of the transaction on them. He has not shown a likelihood to prevail on the merits with re-

spect to labor protection nor has he shown that the employees could not be made whole in the event that the Commission imposes labor protection in any exemption revocation.

Decision Denying Administrative Stay, at 3 (Sept. 22, 1987). The ICC rejected Simmons' arguments on behalf of the C & NW employees and on behalf of the public interest.

Simmons filed a petition to reopen, on the grounds that the profitability of the Poplar Grove–Chemung line had not been correctly calculated, that the ICC had applied an unwarranted assumption that new short-line carriers provide better service than their prior owners, and that without discovery concerning the relationship between Seegers and CCRC the ICC could not properly assess the market power argument. The ICC declined to reopen the case. Simmons petitioned this court to review the agency action pursuant to 28 U.S.C. § 2321(a). CCRC and C & NW have intervened.

## II. ANALYSIS

The ICC has challenged Simmons' standing to petition for review, arguing that the labor interests represented by Simmons do not fall within the zone of interests protected by the Interstate Commerce Act. Although substantial evidence in the record appears to support the ICC on the merits, we first must determine whether Simmons has standing.

Simmons points to injuries that might be incurred by shippers, competitors, and the public at large. However, Simmons only represents labor interests, specifically the interests of those UTU members adversely impacted by the ICC's decision.[2] These UTU members must have standing in their own right, for Simmons cannot rest his

claim on the interests of third parties. *Warth v. Seldin,* 422 U.S. 490, 499–500, 95 S.Ct. 2197, 2205–2206, 45 L.Ed.2d 343 (1975).

Standing is limited both by Article III requirements and prudential concerns. The Seventh Circuit summarized the Article III requirements in *City of Evanston v. Regional Transportation Authority,* 825 F.2d 1121, 1123 (7th Cir.1987), *cert. denied,* 484 U.S. 1005, 108 S.Ct. 697, 98 L.Ed.2d 649 (1988):

> In order for a party to have standing to bring suit in federal court, three requirements must be met: (1) the party must personally have suffered an actual or threatened injury caused by the defendant's allegedly illegal conduct, (2) the injury must be fairly traceable to the defendant's challenged conduct, and (3) the injury must be one that is likely to be redressed through a favorable decision.

Simmons alleges that members of the UTU will lose their jobs due to the sale of the line. This injury satisfies all three prongs of the Article III standing requirement. However, Simmons must also satisfy prudential limitations on standing.[3]

One such requirement is the "zone of interest" standing test first articulated in *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). See Wright, Miller & Cooper, *Federal Practice and Procedure:* Jurisdiction 2d § 3531.7. The Supreme Court explained the application of the zone of interest test to the review of an agency action in *Clarke v. Securities Industry Association,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987):

> The zone of interest test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plain-

---

**2.** For the UTU (represented by Simmons) to have standing to represent its members, it must show that UTU members would have standing to sue in their own right, that the interests being asserted are germane to the UTU's purpose, and that individual UTU members are not needed to participate. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

**3.** Prudential limitations "deny standing as a matter of judicial prudence rather than constitutional demand." Wright, Miller & Cooper, *Federal Practice and Procedure:* Jurisdiction 2d § 3531.7.

tiff should be heard to complain of a particular agency decision. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.

*Id.* at 399, 107 S.Ct. at 757. The Court noted that in past decisions it had "recognized the presumption in favor of judicial review of agency action, but held that this presumption is 'overcome whenever the congressional intent to preclude judicial review is "fairly discernible in the statutory scheme."'." *Id.*, quoting *Block v. Community Nutrition Institute*, 467 U.S. 340, 351, 104 S.Ct. 2450, 2456, 81 L.Ed.2d 270 (1984), quoting *Data Processing*, 397 U.S. at 157, 90 S.Ct. at 831.

*Clarke* involved a trade association representing securities brokers, underwriters, and investment bankers bringing an action for review of an agency decision under the National Bank Act.

In considering whether the zone of interest test provides or denies standing in this case, we first observe that the Comptroller's argument focuses too narrowly on 12 U.S.C. § 36, and does not adequately place § 36 in the overall context of the National Bank Act. As *Data Processing* demonstrates, we are not limited to considering the statute under which respondent sued, but may consider any provision that helps us to understand Congress' overall purposes in the National Bank Act.

*Clarke*, 479 U.S. at 401, 107 S.Ct. at 758. The Court concluded that the respondent in *Clarke* was within the zone of interests intended to be protected by the National Bank Act.

The issue in this case is whether the Interstate Commerce Act, 49 U.S.C. § 10101 et seq., was enacted to protect the zone of interests asserted in this case; i.e., the interest of rail employees in retaining their jobs. 49 U.S.C. § 10505(g) states that "the Commission may not exercise its au-thority [to exempt transactions] under this section ... to relieve a carrier of its obligation to protect the interests of employees as required by this subtitle [the Interstate Commerce Act]." Section 10505(a) specifically refers to § 10101a, which lists the overall interests which the Interstate Commerce Act seeks to protect through its rail transportation policy. The policy mainly concentrates on maintaining a safe and competitive railroad system. In contrast to other provisions of the Act, the only stated interest specifically applicable to rail employees is contained at subsection 12: "To encourage fair wages and safe and suitable working conditions in the railroad industry...." The pertinent provisions of the Interstate Commerce Act clearly are not intended to protect a rail employee's interest in retaining his job. Therefore the Act's zone of interests does not encompass the only UTU members' interest which Simmons alleges the ICC's action threatens. Simmons has no standing to petition for review under *Clarke*.

Simmons argues he has standing as a representative of the public, citing *Scripps–Howard Radio v. Federal Communications Commission*, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229 (1942), and *Federal Communications Commission v. Sanders Bros. Radio Station*, 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 1037 (1940). However, as the Supreme Court noted in *Sierra Club v. Morton*, 405 U.S. 727, 737, 92 S.Ct. 1361, 1367, 31 L.Ed.2d 636 (1972): "Taken together, *Sanders* and *Scripps–Howard* ... established a dual proposition: the fact of economic injury is what gives a person standing to seek judicial review under the statute, but once review is properly invoked, that person may argue the public interest in support of his claim that the agency has failed to comply with its statutory mandate. It was in the latter sense that the 'standing' of the appellant in *Scripps–Howard* existed only as a 'representative of the public interest.'" (Footnotes omitted.) Since Simmons has not established standing in his own right (as representative of UTU members), he cannot have standing as a representative of the public interest.

For these reasons Simmons' petition for review is dismissed for lack of standing.

DISMISSED.

## ON PETITION FOR REHEARING AND REHEARING EN BANC

Before BAUER, Chief Judge, and CUMMINGS, WOOD, JR., CUDAHY, POSNER, COFFEY, FLAUM, EASTERBROOK, RIPPLE, MANION and KANNE, Circuit Judges.

On May 1, 1990, the petitioner filed a petition for rehearing with suggestion for rehearing en banc. An answer to the petition was requested and joint responses thereto were filed by respondents Interstate Commerce Commission and United States of America as well as by intervening respondents Chicago and North Western Transportation Company and Chicago–Chemung Railroad Corporation. All of the judges on the original panel voted to deny a rehearing. A judge in regular active service requested a vote on the suggestion for rehearing en banc and the majority of the judges voted to deny an en banc rehearing. CUDAHY and RIPPLE, Circuit Judges, voted to grant rehearing. Accordingly, the petition for rehearing is hereby DENIED.

CUDAHY, Circuit Judge, with whom RIPPLE, Circuit Judge, joins, dissenting from the denial of rehearing en banc:

The present *Simmons* opinion denies standing to railroad labor to challenge the exempt acquisition of a rail line under the Interstate Commerce Act (the "ICA"). This is a decision of exceptional importance since it is the first known instance in a very long history of employee participation where standing has been denied to railroad labor in a proceeding in which job elimination is a consideration. There have, of course, been many thousands of administrative proceedings and appeals to the courts involving line abandonments, mergers, line sales and the like in which employee representatives have participated without question both in the agency and in court.[1] To assert that job protection lies outside the "zone of interests" arguably protected by the ICA seems to me to ignore the history of railroad regulation for most of the twentieth century. The ICA certainly recognizes loss of jobs as a crucial problem, even if the principal mode of "protection" is via the imposition of conditions of compensation.

The full court ought to consider whether the zone of interests test has been applied too narrowly here and without sufficient attention to congressional intent as incorporated in a number of the ICA's provisions applicable to various forms of restructuring rail service. *See, e.g.,* 49 U.S.C. §§ 11347, 10901(e), 10505(g). Rail employees, through their representatives, have a statutory right to participate in ICC proceedings affecting labor interests. 49 U.S.C. section 10328(a) provides:

> (a) Designated representatives of employees of a carrier may intervene and be heard in a proceeding arising under this subtitle that affects those employees.

The affected employees' right of intervention in both ICC *and* judicial proceedings was declared more than four decades ago in *Railroad Trainmen v. Baltimore & Ohio R.R. Co.,* 331 U.S. 519, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947). Interpreting section 17(11) of the ICA[2]—the predecessor to the current section 10328(a)—the Supreme Court expressly rejected an argument that affected employees could intervene only in

---

1. Patrick Simmons is the Illinois Legislative Director of the United Transportation Union. Simmons has appeared quite recently before this court. On these occasions, his claims were considered on the merits; no attack was mounted to his standing to seek review of ICC decisions affecting the railroad employees he represents. *See Simmons v. ICC,* 871 F.2d 702 (7th Cir.1989); *Simmons v. ICC,* 760 F.2d 126 (7th Cir.1985), *cert. denied,* 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986); *Simmons v. ICC,* 766 F.2d 1177 (7th Cir.1985), *cert. denied,* 474 U.S. 1055, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986).

2. Section 10328(a) is virtually identical to the former section 17(11), which provided:

> Representatives of employees of a carrier, duly designated as such, may intervene and be heard in any proceeding arising under this chapter and chapters 8 and 12 of this title affecting such employees.

proceedings before the Commission but not in court proceedings. The Court said:

> Here the meaning of § 17(11) is unmistakable on its face. There is a simple, unambiguous reference to "any proceeding arising under this Act" or, as the House committee paraphrased it, to "any proceedings arising under part I." There is not a word which would warrant limiting this reference so as to allow intervention only in proceedings arising under § 17 or in proceedings before the Commission. The proceedings mentioned are those which arise under this Act, an Act under which both judicial and administrative proceedings may arise....
>
> Nor do we perceive any reason of statutory policy why the framers of § 17(11) should have wished to confine the right of intervention by employee representatives to proceedings before the Commission. Occasions may arise, as in this case, where the employee representatives have no interest in intervening in the original administrative proceeding, but where they have a very definite interest in intervening in a subsequent judicial proceeding arising under the Act. When the framers have used language which covers both proceedings, we would be unjustified in formulating some policy which they did not see fit to express to limit that language in any way.

331 U.S. at 529–30, 67 S.Ct. at 1392–93 (footnotes omitted). The Court reaffirmed its view that employees have standing to intervene in *any* proceeding arising under the Act in *American Trucking Ass'ns v. United States*, 355 U.S. 141, 144, 146–47, 78 S.Ct. 165, 168–69, 2 L.Ed.2d 158 (1957). The present opinion cites no decision of the Supreme Court or, indeed, of any other court that purports to limit or overrule *Baltimore & Ohio.*

The panel's opinion correctly notes that there is a presumption in favor of judicial review of agency action. *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987) (construing section 10 of the Administrative Procedure Act, 5 U.S.C. § 702). Because of this presumption, the Supreme Court declared in *Clarke* that the zone of interests test "is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff." *Id.* at 399–400, 107 S.Ct. at 757–58 (footnotes omitted). As I have indicated, the ICA in fact makes specific provision for the protection of railroad workers in a number of railroad restructuring schemes. Further, rail labor's statutory right of intervention alone ought to indicate that employees' interests are not "marginally related to or inconsistent with the purposes implicit in" the Interstate Commerce Act. *Clarke*, 479 U.S. at 399, 107 S.Ct. at 757. The whole court ought to weigh the apparently implausible proposition that Congress would by statute guarantee employees a role in ICC proceedings and in the courts, but, without any express provision to that effect, intend to deny them standing to appeal from one to the other.

There is certainly a strong possibility that the panel's construction of 49 U.S.C. section 10101a(12) undermines Congress's intention that the voice of labor be heard. Section 10101a(12) provides that it is the policy of the United States Government to encourage fair wages and safe and suitable working conditions in the railroad industry. Having a job is obviously a necessary prerequisite to "fair wages and suitable working conditions." Loss of employment would therefore seem to fall squarely within the zone of interests with which the ICA and other railroad regulatory and deregulatory legislation is concerned.

Indeed, it has evidently gone unquestioned for decades that the potential impact of ICC decisions upon railroad employees falls within the zone of interests protected by the ICA. More than fifty years ago—long before the coining of the phrase "zone of interests"—Justice Harlan Fiske Stone recognized that the "public concern," as defined by the ICA, encompasses the blow to railroad employees who suffer displacement in the wake of a railroad consolidation. Writing for a unanimous Court, Justice Stone observed:

> One must disregard the entire history of railroad labor relations in the United

States to be able to say that the just and reasonable treatment of railroad employees in mitigation of the hardship imposed on them in carrying out the national policy of railway consolidation, has no bearing on the successful prosecution of that policy and no relationship to the maintenance of an adequate and efficient transportation system.

.    .    .    .    .

The now extensive history of legislation regulating the relations of railroad employees and employers plainly evidences the awareness of Congress that just and reasonable treatment of railroad employees is not only an essential aid to the maintenance of a service uninterrupted by labor disputes, but that it promotes efficiency, which suffers through loss of employee morale when the demands of justice are ignored.

*United States v. Lowden,* 308 U.S. 225, 234, 235–36, 60 S.Ct. 248, 253, 254, 84 L.Ed. 208 (1939). It appears that the panel in this case may have overlooked this history lesson.

It may be that the ICA does not explicitly provide for the preservation of jobs as a goal in and of itself. But the procedures set up under the Act surely recognize that loss of jobs is an inevitable and unfortunate result of railroad consolidations and abandonments, and, consequently, the Act provides that those affected have a right to be heard. A hearing is all that has been asked of us here.

This case presents a very difficult and important question—one which deserves the consideration of the entire court. I therefore respectfully dissent from the court's denial of rehearing en banc.