UNITED TRANSPORTATION UNION–ILLINOIS LEGISLATIVE BOARD, Petitioner,

v.

SURFACE TRANSPORTATION BOARD and United States of America, Respondents.

No. 98–3412.

United States Court of Appeals, Seventh Circuit.

Argued May 12, 1999.

Decided June 29, 1999.

Rehearing Denied Sept. 20, 1999.

---

Gordon P. MacDougall (argued), Washington, DC, for Petitioner.

Marilyn R. Levitt (argued), Surface Transportation Board, Washington, DC, for Respondent Surface Transportation Board.

Robert J. Wiggers, Department of Justice, Antitrust Division, Appellate Section, Washington, DC, for Respondent U.S.

Before COFFEY, RIPPLE and ROVNER, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

The United Transportation Union–Illinois Legislative Board (the "Union") challenges several determinations of the Surface Transportation Board (the "Board") as to whether Effingham Railroad Company ("Effingham Railroad") required Board authorization to operate various sections of track in and near an industrial park in Effingham, Illinois. The Board, for its part, contends that the Union lacks standing to sue and defends its own determinations. We hold that the Union has standing, but we deny the Union's petition for review because, under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the determinations of the Board were based on a reasonable agency interpretation of the applicable statutes.

**I.**

The City of Effingham, Illinois, is served by the Illinois Central Railroad ("Illinois Central") and Consolidated Rail Corporation ("Conrail"). In November 1996, Effingham Railroad, a new carrier which had not yet begun operations, proposed to the Board (in its "Proposal I") to operate approximately 206.05 feet of existing track, which it intended to acquire from Agracel Corporation ("Agracel"). This existing track was part of a 490–foot track (called "the beer track" because it was used to transfer beer from rail cars to trucks) connected to Conrail's line. Effingham Railroad also proposed to construct 9,835 feet of new track within the industrial

park. Ready–Mix, an existing shipper located in the industrial park, and which apparently did not have rail service, would be served by 1,867 feet of this new track. This track would also serve new shippers that might locate in the industrial park.

Normally provision of rail service as part of the interstate rail network, 49 U.S.C. § 10501(a)(2), including construction, acquisition, or operation of extended or additional "railroad line[ ]," requires authorization from the Board, *see* 49 U.S.C. § 10901, unless the transaction is exempted from Board regulatory requirements under recent deregulatory initiatives. *See* 49 U.S.C. § 10502 and 49 C.F.R. § 1150.31(a). However, Board authorization is not required for the construction, acquisition, or operation of "spur, industrial, team, switching, or side track[ ]" (hereinafter "spur" track). 49 U.S.C. § 10906 (providing an exception to Board authority under § 10901).[1]

Effingham Railroad asked the Board for a declaratory order that the Board lacked "jurisdiction" under the § 10906 spur track exception over the new and existing track it proposed to operate within the industrial park. Alleging union employee safety and environmental concerns, the Union opposed Effingham Railroad's petition. The proposed construction, the Union argued, was railroad line under § 10901, requiring Board authorization or exemption. In opposing the petition, the Union did not address the classification of the "beer track" segment. The Board rejected Effingham Railroad's petition in an order of September 8, 1997 ("Decision I"), treating all the track discussed in the petition as § 10901 railroad line and instructing Effingham Railroad to file an application for authorization or a notice of exemption. The Union then petitioned the Board to reconsider its determination

---

1. To be exact in our terminology, transactions involving track classified as "railroad line," over which the Board has authority under 49 U.S.C. § 10901, but which have been exempted under 49 U.S.C. § 10502 and 49 C.F.R. § 1150.31(a), are referred to as "exempted." Transactions involving track classified as "spur track," over which the Board has no authority under 49 U.S.C. § 10906, are referred to as "excepted."

that the "beer track" segment in particular was railroad line, arguing that this segment was properly classified as spur and also that the Board should simply have declined to issue a declaratory order and refrained from making any determination about the status of the track. This petition was denied.

A few weeks later in September 1997, Effingham Railroad filed the appropriate notices seeking an exemption for operation of railroad line pursuant to 49 C.F.R § 1150.31(a). Such exemptions are available and effective automatically seven days after filing, see id. § 1150.41 et seq., although they are subject to revocation upon a proper showing that regulation of the track is necessary to carry out federal rail transportation policy. See 49 U.S.C. § 10502(d). By the time of this new filing, Effingham Railroad's proposal had changed. According to its Proposal II, Effingham Railroad would now operate the 206.05–foot segment of the "beer track" under a lease or operating agreement from Agracel instead of purchasing that track. It would also operate a longer segment of new track under sidetrack agreements with Total Quality Warehouse ("TQW"), a noncarrier shipper that would construct and own the track. Effingham Railroad and TQW are distinct and, apart from the arrangement just described, unrelated enterprises. The new track to be constructed by TQW would now comprise two segments: (1) 400 feet of sidetrack (the "warehouse track") connecting with the beer track, serving a new facility to be built by TQW, which had an existing facility on the beer track, and (2) 9,210 feet of sidetrack (the "long track") connecting Effingham Railroad with Illinois Central. No one requested Board authorization or

filed any notice of exemption for the construction of the long track.

In September and December 1997, the Union filed petitions to "reject, revoke, or stay" ·Effingham Railroad's exemptions and for reconsideration of Decision I. The Union argued that: (1) the beer track should be classified as excepted spur track; (2) Decision I required that the warehouse track should be classified as railroad line; and (3) the exemption for operation of the long track, undisputedly classified as railroad line, should be withheld because its construction by TQW was a device to circumvent the normal requirement of environmental analysis for such construction. In an order of September 18, 1998 ("Decision II"), however, the Board reaffirmed its determination in Decision I that the beer line was § 10901 railroad line requiring authorization or exemption and further determined that the warehouse track was § 10906 spur track excepted from Board authority. Finally, the Board found that the long track was railroad line and declined to revoke Effingham Railroad's exemption for that track. This appeal followed.

## II.

■■■■ The Board argues that the Union's petition should be dismissed for lack of standing because the Union failed to show the actual or imminent, concrete and particularized injury, see *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), which is the first prong of the Article III requirements for standing to sue in federal court.[2] But the Union argues that its members risk losing their jobs by virtue of the Board's decisions, and we have held that "this injury satisfies all three prongs of the Article III standing requirement." *Simmons v.*

---

**2.** In order for a party to bring suit in federal court, three constitutional requirements under Article III must be met: (1) the party must have personally suffered an actual or threatened injury caused by the defendant's illegal conduct; (2) the injury must be fairly traceable to the challenged conduct; and (3)

the injury must be one that is likely to be redressed by a favorable decision. *Simmons v. Interstate Commerce Comm'n*, 909 F.2d 186, 189 (7th Cir.1990) (*citing City of Evanston v. Regional Transp. Authority*, 825 F.2d 1121, 1123 (7th Cir.1987)).

*Interstate Commerce Comm'n*, 900 F.2d 1023, 1026 (7th Cir.1990). We have indeed also held that the Union's interest in preserving jobs in the context of federal railway law fails our prudential, nonconstitutional standing requirements on the grounds that it is not within the "zone of interest"[3] of the old Interstate Commerce Act, 49 U.S.C. § 10101 *et seq.*, because the statute does not mention a worker's interest in his or her job, *see Simmons*, 909 F.2d at 190, although we have not decided whether this holding survives the Interstate Commerce Commission ("ICC") Termination Act of 1995, Pub.L. 104–88, 109 Stat. 803, 941. Because the Board does not raise the issue of prudential standing, however, it has waived any argument based on that doctrine. *See Lindley for Lindley v. Sullivan*, 889 F.2d 124, 129 (7th Cir.1989); *MacLauchlan v. Prudential Ins. Co.*, 970 F.2d 357, 359 (7th Cir.1992). The Union has standing here to sue on the basis of job loss.[4]

■ In any event, the environmental concerns raised by the Union about health and safety risks posed to its members by the construction of the warehouse track and the long track are sufficient to establish Union standing. All three Article III standing requirements are satisfied: (1) the risk of environmental injury to employees (2) caused by railroad construction and operation is both obvious and acknowledged by the Board's own regulations, *see* 49 C.F.R. § 1105.6 (requiring Environmental Impact Statement for certain railroad construction), and (3) the requested reme-

dy is essential to redressing the harm alleged. The prudential requirements are satisfied, since the governing statute expressly makes it federal rail transportation policy "to encourage ... safe and suitable working conditions in the railroad industry," 49 U.S.C. § 10101(11). Unionized railroad employees who have health and safety concerns about the environment at work are within the zone of protection of § 10901 because they are among the chief intended beneficiaries of the federal rail transportation policy under § 10101.

■ The Board further disputes whether environmental concerns are germane to the Union's purpose,[5] but it is difficult to see what might be more germane to the purpose of a union than protecting its members from environmental risks that could affect job-related health and safety. In labor relations, practices affecting safety, sanitation, and health are considered mandatory subjects of bargaining. *See, e.g., Library of Congress v. Federal Labor Relations Authority*, 699 F.2d 1280, 1286 (D.C.Cir.1983) ("[F]ew policies and practices could be considered more central to an employee's working conditions than those relating to job safety."); *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 222, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964) (Stewart, J., concurring) (Safety practices are conditions and terms of employment.). These concerns do not cease to be germane to the Union's purpose where the lawsuit concerns a requirement

**3.** For the "zone of interest" test, *see Simmons*, 909 F.2d at 186 (*citing Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (no review of challenged action where plaintiff's interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be reasonably assumed that Congress intended to permit the suit")).

**4.** In some circumstances, moreover, we may "elide the jurisdictional issue" in order to reach the merits even prior to resolving a question of statutory or prudential standing. *See McNamara v. City of Chicago*, 138 F.3d

1219, 1222 (7th Cir.1998) (*citing Steel Company v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 1013 & n. 2, 140 L.Ed.2d 210 (1998)).

**5.** An association such as the Union has standing to represent its members if: (1) its members could sue in their own right; (2) the interests asserted are germane to the Union's purpose; and (3) individual Union members are not needed to participate. *Simmons*, 909 F.2d at 189 n. 2 (*citing Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

for an Environmental Impact Statement implicating health and safety on the job.

## III.

■ In a recently decided case, *United Transp., Union–Illinois v. Surface Transportation Board*, 169 F.3d 474 (7th Cir. 1999) (*Chicago Rail Link*), we reviewed a similar Board decision about whether certain track proposed to be acquired and operated by a rail carrier was railroad line or spur, applying "the high level of deference accorded to an agency's reasonable interpretation of the statutes which the agency administers." *Id.* at 476 (*citing Chevron*, 467 U.S. at 842, 104 S.Ct. 2778); *Bankers Life and Casualty Co. v. United States*, 142 F.3d 973, 983 (7th Cir.1998); *see also NLRB v. GranCare, Inc.*, 170 F.3d 662, 666 (7th Cir.1999) (en banc). Without actually addressing whether *Chevron* applies, the Union asserts that the proper standard of review is the less deferential standard that agency findings are to be set aside if arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A).

■ If we reframe its argument in terms of whether *Chevron* applies,[6] the Union can be taken to urge that the Board's determinations about the proper classification of track are not entitled to deference because § 10906 states that the Board "has no authority" over the construction, acquisition, or operation of spur track, and therefore lacks "jurisdiction" over such transactions. The Union interprets the question of how track is to be classified as one concerning the scope of agency jurisdiction, and maintains that courts will therefore closely examine the Board's decision. The Union cites no authority for this proposition, but an agency's determination about the scope of its own jurisdiction indeed does receive de novo review and not *Chevron* deference. *See Chicago Rail Link*, 169 F.3d at 477 (*citing Midland Coal Co. v. Office of Workers' Comp. Programs*, 149 F.3d 558,

561 (7th Cir.1998) (Jurisdictional determinations are "a matter within the peculiar expertise of the courts.")). It would not receive "arbitrary and capricious" review in any event.

■■ The statutory language the Union cites, however, does not support any less deferential review than dictated by *Chevron*. The § 10906 exception states that the Board "does not have authority" over "construction, acquisition, operation, abandonment, or discontinuance of spur ... track," but this does not mean that the Board lacks jurisdiction over such transactions. That would flatly contradict the unambiguous statutory language providing that the Board has "exclusive" jurisdiction over the "construction, acquisition, operation, abandonment, or discontinuance" of spur track. 49 U.S.C. § 10501(b)(2). Statutory provisions are to be interpreted to be consistent with one another. *Chicago Rail Link*, 169 F.3d at 480. It is unreasonable to interpret one provision as eliminating another unless the language requires it. *United States v. Kirschenbaum*, 156 F.3d 784, 790 (7th Cir.1998). Here the language does not require it. The § 10906 no-authority language means no *authority*, not no *jurisdiction*. These sorts of transactions involving spur track do not call for the Board authorization which is required for construction, acquisition, or operation of extended or additional rail line under § 10901 and § 10902, but the Board nonetheless retains exclusive jurisdiction under § 10501(b)(2).

■ Since the Board's jurisdiction over railroad line under § 10901 is uncontested and its jurisdiction over spur track is manifest, the dispute here about classification of the track at issue, like the dispute in *Chicago Rail Link*, is not about whether the Board has jurisdiction, but about under which provision of the statutes administered by the Board it exercises jurisdiction. "When one among several statutes

---

6. The Union's other arguments that some other standard of review than *Chevron* should

apply in this case are canvassed and rejected in *Chicago Rail Link,* 169 F.3d at 476–477.

that an agency administers [clearly] applies, but it is unclear from the plain language of the statute itself precisely which one is applicable, the agency's choice among which of the several statutes to apply is not a jurisdictional but an interpretative decision that is located squarely in the heartland of *Chevron* deference." *Chicago Rail Link,* 169 F.3d at 476. "Special circumstances" might nonetheless sometimes justify less deference in such a case, *id.,* but the Union alleges no such circumstances here.

 We therefore apply *Chevron.* Under the first step of a *Chevron* analysis, courts do not defer to even reasonable agency interpretation if "Congress has spoken directly to the precise point at issue," *Chevron,* 467 U.S. at 842, 104 S.Ct. 2778; *i.e.,* if the statutory language, with or without the support of legislative history, is clear, unambiguous, and directly governs the challenged decision. If the statute is "silent or ambiguous with respect to the specific issue," we proceed to the second step, deferring to reasonable agency interpretations of unclear statutory language. *Id.* at 843, 104 S.Ct. 2778. *Chevron* deference is not abject or "rubber stamp" deference, *see Chicago Rail Link,* 169 F.3d at 477; agency interpretation of even an ambiguous or silent statute the agency administers will be set aside if unreasonable. *See id.* (*citing Bankers Life and Casualty,* 142 F.3d at 983). In finding an agency's construction of an ambiguous statute to be reasonable under *Chevron,* we do not thereby hold the agency's interpretation to be the correct statement of the law as determined by this court, but rather hold it to be a reasonable interpretation and therefore deserving of judicial deference in view of the agency's role in administering the statute.

 With respect to the Board's decisions to classify the beer track segment as railroad line and the warehouse track as spur, the Union offers no argument that the statute plainly dictates contrary results, and so we inquire here only whether the Board's determinations were reasonable. In deciding how to classify each track, the Board applied a test based on the "intended use" of the track. See *Nicholson v. Interstate Commerce Comm'n,* 711 F.2d 364, 367 (D.C.Cir.1983). Under this test, track is railroad line if it extends into new territory not served by the carrier or already served by another carrier. A focus on use must not obscure "the larger purpose and effect of the transaction at issue." *Brotherhood of Locomotive Eng'rs v. Surface Transportation Board,* 101 F.3d 718, 728 (D.C.Cir.1996). New or proposed track is " 'an extension of the railroad,' " and so constitutes railroad line, as long as " 'the purpose and effect of the new track[ ] is to extend substantially the line of a carrier into new territory,' " even if the track is short and " 'the character of the service contemplated [is] commonly rendered . . . by means of spur[ ] tracks.' " *Id.* (*quoting Texas & Pacific Ry. Co. v. Gulf, Colorado, & Santa Fe Ry. Co.,* 270 U.S. 266, 278, 46 S.Ct. 263, 70 L.Ed. 578 (1926)). If the track is or has been used or owned by more than one carrier, what controls classification of the track as spur or railroad line is the tenant railroad's use. *Id.* at 727–728.

In *Chicago Rail Link,* 169 F.3d at 478–479, we held that the Board's adoption of this test was reasonable and indeed the Union here challenges only the reasonableness of the test as applied. In Decisions I and II, the Board found that "the larger purpose and effect" of Effingham Railroad's Proposal I was to construct track that would constitute Effingham Railroad's entire line of railroad (including the existing beer track) in order to serve new shippers, operating in territory it had not previously served. The Union objects that it was unreasonable to classify the beer track as railroad line under Effingham Railroad's proposed use, since the Board had hitherto classified that track as spur under the use made of it as siding by Conrail, the previous tenant. But the Union cites no authority for the proposition

that a previous tenant's use controls over the present tenant's use. It was reasonable for the Board to classify the track in virtue of the present tenant's use.

■ In Decision II, the Board then found that the warehouse track in Proposal II was excepted spur. It found that Effingham Railroad was then the carrier serving the industrial park, with the beer track as its railroad line, and that the warehouse track therefore would not extend Effingham Railroad's operations into the territory of another railroad. The long track, by contrast, extended beyond the boundaries of the industrial park to establish connections with other railroads, and so, under the tenant use test, was railroad line properly subject to a notice of exemption. The Union correctly argues that the Board's determination that the warehouse track was spur cannot be sustained if we set aside as unreasonable the Board's prior determination that the beer track was railroad line. Since we do not disturb the beer track finding, however, we have no reason to disturb the warehouse track determination.

■ The last issue concerns the construction of the long track, undisputedly properly classified as railroad line under 49 U.S.C. § 10901. Effingham Railroad obtained only an exemption for operation of the long track and not its construction. The long track was to be constructed by TQW, a noncarrier shipper not affiliated with Effingham Railroad, neither of which sought authorization or exemption for this construction. The Union claims that it was illegal for Effingham Railroad's operation to be exempted unless TQW's construction was authorized or exempted. The Union's underlying concern appears to be that without Board authorization, the long track can be constructed without the normally required environmental analysis, see 49 C.F.R. §§ 1105.5(b)(1) & 1105.6; thereby risking exposing Union members who work in the industrial park to environmental hazards caused by that construction.

The Union offers no reason beyond bald assertion to doubt that *Chevron* applies to the Board decisions to exempt the operation of the long track from authorization, so we apply that standard. Because the statutory language of § 10901 does not clearly and unambiguously compel the result the Union desires, we review the agency's determination under the second prong of *Chevron*, giving deference to reasonable agency interpretation of the statute. The Union seems to argue that the Board's interpretation was unreasonable because the language of § 10901 requires "a person" to obtain Board authorization to "construct an extension to any of its railroad lines" or "construct an additional railroad line." The Union argues that TQW is a "person," for § 10901 purposes, referring to *Texas & New Orleans R.R. Co. v. Northside Ry. Co.*, 276 U.S. 475, 480 n. 1, 48 S.Ct. 361, 72 L.Ed. 661 (1928) (listing cases where the ICC applied the predecessor of § 10901 to the construction and operation of new lines by a corporation not theretofore a carrier). So, the Union thinks, TQW required Board authorization or exemption for construction of the long track. Since TQW had none, the Union concludes that exempting Effingham Railroad from authorization for operation must have been a violation of § 10901.

But first, § 10901 does not unambiguously say that a noncarrier shipper is a "person" within the meaning of the statute. The question is not much illuminated by the rather old cases cited in *Texas & New Orleans R.R.* (itself not current) which at any rate address only noncarriers that, unlike TQW, would become carriers upon commencing operation over newly constructed line. It would have been reasonable, therefore, for the Board not to have treated TQW as a "person" requiring authorization or exemption for construction of railroad line under § 10901. Furthermore, even if TQW were a "person" within the meaning of § 10901, the language of the statute does not make it clear whether, in the circumstances, the long track is an

"exten[ded]" or "additional" railroad line. These are the only sorts of track construction of which requires authorization under § 10901 by the terms of the statute. Since nothing in the record indicates that TQW has any other railroad lines for the long track to be an extension of or addition to, the Board would not have been unreasonable to find that the long track was not extended or additional railroad line. Finally, even if TQW did require authorization or exemption for the construction of the long track—we do not say that TQW required any such thing—it simply does not follow that Effingham Railroad may not be exempted from authorization to operate the track. The language of § 10901 does not say or imply that track newly constructed without proper authorization by a noncarrier shipper may not properly be granted authorization or exemption for operation by a completely different and unrelated carrier. The Board would not have been unreasonable to refuse to read into the statute a novel and nontextual principle of this sort.

The Union's petition for review of the determinations of the Board is therefore DENIED.